In the Matter of the Application of the TRUSTEES OF THE
IMPORTERS AND GROCERS' EXCHANGE of New York for a
Voluntary Dissolution.

HENRY F. HITCH et al., Petitioners, Respondents, *v.* HENRY
E. HAWLEY et al., Objectors, Appellants.

A corporation organized under the act of 1877 (Chap. 228, Laws of 1877),
providing for the organization of exchanges or boards of trade, may be
disolved by the court upon petition and consent of a large majority
of its trustees and members, when it appears that it is doing no busi-
ness, because of the diverse interests of its members, although the
corporation is solvent and a minority of the trustees and members oppose
the dissolution.    (Code Civ. Pro. §§ 2419–2432.)

When it appears that the interests of the stockholders of such a corpora-
tion are so discordant as to prevent efficient management, and that a
large majority of its trustees and members wish to wind up its affairs
by a dissolution, the fact is established that the dissolution will be for
the interests of the stockholders.

(Argued February 8, 1892; decided March 15, 1892.)

APPEAL from order of the General Term of the Court of
Common Pleas for the city and county of New York, made
December 19, 1889, which reversed an order of Special Term
denying the application for dissolution and granted the motion
to dissolve.

This was a special proceeding for the dissolution of a cor-
poration organized August 21, 1883, pursuant to chapter 228
of the Laws of 1877, under the corporate name of the
"Importers and Grocers' Exchange of New York," to con-
tinue for the period of fifty years.

The proceeding was initiated by the petition of a majority
of the trustees and the practice pursued, as to which no ques-
tion is raised, was that prescribed by sections 2419 to 2432 of
the Code of Civil Procedure. From the report of the referee,
to whom it was referred to take the proofs and determine the
facts, it appeared that the object of the corporation, as set forth
in its charter certificate, was "to foster trade and commerce in

groceries and East Indian and South American products ; to protect such trade from unjust and unlawful exactions ; to reform abuses in such trade and diffuse accurate and reliable information among its members; to produce uniformity and certainty in the customs and usages of the trade in said merchandise ; to settle differences between the members of said corporation arising out of the trade in said merchandise, and to promote a more enlarged and friendly intercourse between merchants engaged in said trade and generally to increase the facilities for conducting the trade in groceries and East Indian and South American products." The amount of the capital stock was $3,750, divided into fifteen shares of $250 each, one share being held, *ex officio*, by each of the fifteen trustees, and upon the expiration of his term of office, passing under the by-laws to his successor. The members were elected by the trustees and each one was required to pay an initiation fee of $250, until the number equaled one hundred, after that $500, until there were two hundred, and after that $1,000. The certificates of membership are transferable, provided the transferee is approved by the committee on membership and the governing committee. There are now 220 certificates outstanding, held by 216 members. The Exchange began work in November, 1883, occupying commodious rooms, furnished with black-boards, call stands and all the usual appliances for the convenient transaction of the business of an exchange. The annual rental was $7,000 and the salary roll nearly as much more. The attendance at first was large and much business was done, chiefly in teas and sugars for future delivery. Speculation in tea was so active that prices gradually rose from nineteen to thirty-four cents a pound, but the market became demoralized in consequence, failures resulted, business ran down, the attendance fell away and all efforts at resuscitation were in vain. From November, 1883, to December, 1884, inclusive, the transactions in tea amounted to more than forty-five million pounds ; in sugar to nearly sixty thousand tons, besides about forty thousand barrels, and in hemp, to nine hundred bales. The decline

began with the collapse caused by speculation in March, 1884, and gradually continued until May 1, 1885, and since then there have been no transactions on the Exchange. In May, 1884, steps were taken to reduce expenses, and in March, 1885, cheaper, though large and convenient, rooms were occupied. In April, 1886, the Exchange removed to small and inconvenient rooms that rented for $450 a year, and in February, 1887, a part of these was surrendered, and since then the rent has been $300 per annum, and the salary roll $15 per week. As early as June, 1885, a move was made to wind up its affairs. At the annual election in 1885 one hundred and eighteen votes were cast, and in 1886 only thirty-four. In April, 1887, the governing committee, composed of the officers and trustees, unanimously resolved to take the necessary legal steps for a dissolution, and appointed a committee for that purpose. Nine out of the fifteen trustees verified the petition by which this proceeding was commenced, and three trustees served an answer. Thirteen members of the present governing committee and 131 holders of certificates of membership either petitioned for a dissolution or testified on the trial that in their opinion it was for the best interest of the members to wind up the Exchange. The opposition is headed by two members and one ex-member of the governing committee, and consists entirely of those interested in the tea trade, but does not include all who are thus engaged. Ten members testified that they were opposed to dissolution, because it furnished the following benefits to the tea merchants: Combined action in state and legislative matters; reliable standards of values; uniform telegraphic and other trade information; accurate monthly statements of teas received and delivered, showing the consumptive demand; machinery to settle disputes as to packing, cooperage and the condition of teas; the establishment of regular warehouse charges, and "the ability to issue certificates of tea upon which money could be borrowed, as collateral." The referee found that such benefits accrued to the tea people from the organization of the Exchange, but that none of those benefits now exist, except

the collection and publication of statistics of the amount of tea
received and in warehouses.   He also found that the Exchange
has outlived its usefulness ; that no business has been done
there for a long time past, and that business cannot be
successfully conducted there ; that the great majority of all
the members desire its dissolution, and that a trust fund,
accumulated from the sale of certificates of membership,
and amounting to $69,648.68, is lying idle, and the members
desire to receive their respective shares thereof.   There are no
debts against the corporation, except a small amount for current
expenses.   The governing committee is elected by the members
of the Exchange, and as a large majority desire a dissolution
they elect a committee in favor of that course.   In the spring of
1886 the trustees prohibited calls of merchandise and refused
to furnish standards of tea unless they were paid for by sub-
scription, although without them business in tea cannot be
successfully done upon the Exchange.   The main reason why
sugar was not dealt in is because the sugar business was largely
in the hands of the sugar refiners, who refuse to deal on the
Exchange or to purchase sugar bought or sold there.   The
referee found expressly that it was for the interest of the
objecting members, or of those engaged in the tea trade, that
the corporation should not be dissolved, and by implication
that it was for the interest of all the others, many more than
half, that it should be dissolved.

The Special Term denied the application and dismissed the
proceeding upon the ground that the Code does not require a
dissolution when it would be beneficial to a majority of the stock-
holders, but injurious to a minority.   (2 N. Y. Supp. 257.)
Upon appeal to the General Term this order was reversed, the
report of the referee confirmed and a decree made, which
after reciting that " it appearing to the court for the reasons
stated in the said report of the referee, that it will be bene-
ficial to the interests of the stockholders and members and not
injurious to the public interests, if a dissolution is ordered,"
dissolved the corporation, appointed a receiver of all its prop-
erty and directed a distribution of the net proceeds among

the members in proportion to the amounts paid by them respectively for their certificates of membership.    (8 N. Y. Supp. 319.)

*Frank E. Blackwell* for appellants.    This exchange is not a corporation contemplated by the Code of Civil Procedure, that is, it clearly was not in the minds of the law makers when the provisions in regard to dissolution were enacted.    (Code Civ. Pro. § 2429.)    Had the Code intended to provide that the interest of a majority of the stockholders should control, it would have said so, but it clearly contemplated a case where it was for the interest of all the stockholders that the corporation should be wound up.    (*In re E. M. B. S. & F. Co.*, 34 Hun, 371 ; *In re P. M. Co.*, 29 id. 430 ; Code Civ. Pro. § 2429.)    The right of a majority of the stockholders or members to surrender the charter of a corporation, or even to do an act having the effect of a surrender, has always been denied in this state.    (*Denike* v. *N. Y. & R. L. Co.*, 80 N. Y. 606 ; *In re S. Assn.*, 15 Civ. Pro. Rep. 215 ; *Abbott* v. *A. H. R. Co.*, 11 Abb. Pr. 204 ; 33 Barb. 578 ; *Ward* v. *Soc. of Attys.*, 1 Colly. 370 ; *In re N. Ins. Co.*, 1 Paige, 258 ; *Kean* v. *Johnston*, 9 N. J. Eq. 401 ; *Curren* v. *Santini*, 16 La. Ann. 27 ; *P. S. Lodge* v. *Santini*, Id. 53 ; *M. & O. R. R. Co.* v. *State*, 29 Ala. 586, 587 ; *N. O., J. & G. N. R. R. Co.* v. *Harris*, 27 Miss. 540 ; *In re P. M. Co.*, 29 Hun, 430.)    By the terms of the articles of incorporation it was provided that " the term of existence of said corporation is to be fifty years."    To alter the period of fifty years would be to impair the obligations of this contract.    (*Black* v. *D. C. Co.*, 22 N. J. Eq. 403, 404, 405, 415, 416 ; *Livingston* v. *Lynch*, 4 Johns. Ch. 573.)

*James Proctor Clarke* for respondents.    This corporation comes within the provisions of title 11, chapter 17, voluntary dissolution, of the Code.    (Code Civ. Pro. §§ 2419, 2431 ; *In re A. D. F. Assn.*, 22 Abb. [N. C.] 234.)    The mere fact that there is a minority opposed to dissolution is not a bar to the proceeding.    (Code Civ. Pro. §§ 2419, 2420, 2429.)    The fact that fifty years is stated in the certificate of incorporation as

the life of the corporation is of no effect. (Morawetz on Corp. § 418; 2 Pars. on Cont. § 569; 3 id. 532; *People* v. *G. M. L. Ins. Co.*, 91 N. Y. 174; *People* v. *O'Brien*, 111 id. 1; Code Civ. Pro. §§ 2419, 2429.)

VANN, J. The question presented by this appeal is whether the court has power to dissolve a corporation organized as an exchange, when it is solvent but doing no business, owing to the diverse interests of its members, upon the petition and consent of a large majority of its trustees and members, in opposition to the wishes of a small minority of both? Whether courts of equity have inherent power to dissolve corporations, as has been held in some jurisdictions but denied in others, it is unnecessary for us to consider, as the method of effecting corporate dissolution, when prescribed by statute as in this state, is exclusive, and must be substantially followed. (*Verplanck* v. *Mercantile Ins. Co.*, 1 Edw. Ch. 84; *Kohl* v. *Lilienthal*, 81 Cal. 378; Spelling on Private Corporations, § 1008.)

The earliest legislation upon the subject, to which our attention has been called, is an act passed in 1817, which authorized the dissolution of incorporated insurance companies, provided the directors, or a majority thereof, presented a petition stating, among other things, that they deemed it necessary or beneficial to the interests of the stockholders; and provided also, that no sufficient cause against dissolution should be shown to the chancellor, "he having due regard to the interests of the stockholders and all persons interested." (L. 1817, ch. 146, §§ 1 to 4.)

The Revised Statutes authorized the Court of Chancery to dissolve any corporation, with certain exceptions not now material, upon the petition of the directors, trustees or other officers having the management of its concerns, or a majority of them, provided it was either insolvent, or if for any reason a dissolution thereof would be beneficial to the stockholders and not injurious to the public interest. (3 R. S. [6th ed.] p. 752, §§ 73–80.)

In 1876 the Supreme Court was authorized, "in its discretion," to dissolve any corporation organized under the Manufacturing Act, provided the trustees consisted of an even number of persons and they were equally divided as to the management of its affairs, and provided that one-half of the stockholders favored the course of one division of the trustees and the other half that of the other. [L. 1876, ch. 442, p. 474.) No ground of action was prescribed, and the power was to be exercised at the discretion of the court. The statute now regulating the subject consists of sections 2419 to 2432 of the Code of Civil Procedure, upon which this proceeding was founded. It applies to all corporations created by or under the laws of this state, except those of a religious, educational, municipal or political character. [§ 3431.] The proceeding may be commenced by the petition of a majority of the directors, trustees or other officers in control, if the corporation is insolvent, or if, for any reason, the petitioners deem it beneficial to the interests of the stockholders that it should be dissolved. (§ 2419.) If the trustees and stockholders are equally divided in respect to the management, one or more of the trustees or directors may present the petition, but this clause does not apply to savings banks, trust, safe deposit, railroad, banking or insurance companies. (§ 2420.) Upon the presentation of a petition showing these jurisdictional facts, as well as some others relating to the condition of the corporation, certain courts are authorized to issue and publish an order to show cause, and upon the return thereof to hear, or refer for hearing, the proofs and allegations of the parties, and to make a final order dissolving the corporation if it appears to the court that it is insolvent, or "that for any reason a dissolution" thereof "will be beneficial to the interests of the stockholders and not injurious to the public interests." (§§ 2421 to 2430.)

The history of legislation upon the subject shows that prior to 1876 it was the policy of the legislature to authorize the courts to act upon the petition of a majority of the trustees, but the basis of action, except in the case of insolvency, was the interest of the stockholders. Division of opinion on the

part of the trustees as to business policy does not appear to have been recognized by the legislature as an element requiring attention until they provided by the act of 1876 that if the trustees and members were equally divided "as to the manage- ment of the affairs of the corporation," the application to dis- solve might be made by "the trustees, or any or either of them." This feature is reproduced by section 2420 of the Code, and it indicates that in the opinion of the legislature dis- sension as to the management, especially when it might result in a deadlock, so that business could not be done efficiently, was sufficient to authorize action by the courts. Where, how- ever, a majority of the trustees favor dissolution "for any rea- son," whether relating to the management or not, and it appears that "for any reason" a dissolution "will be beneficial to the interests of the stockholders and not injurious to the public interests, the court must make a final order dissolving the corporation." (§ 2429.) As it is not claimed that the public interests are here involved, the only question is whether the facts permitted the conclusion that a dissolution would benefit the stockholders. In this case the members were the stockholders, as they owned the stock, but for convenience permitted the trustees to hold it, *ex officio.* The statute, more- over, as amended in 1884, provides for the case of corporations that have no stockholders, but simply members. (§ 2431.) As to what would be beneficial to the interests of the stockholders, it is clear that the opinion of a majority of the trustees, who are presumed to represent the wishes of a majority of the members, is of primary importance, because it is essential to the jurisdiction of the court and must be set forth in the peti- tion. (§§ 2419 and 2429.) The legislature doubtless thought that the stockholders would be the best judges as to their own interests and that if there was a difference of opinion the judg- ment of the majority would be more apt to be right than that of a minority. This case, however, is peculiar, because the interest of the stockholders was not uniform. The object of the exchange was so broad as to include several diverse inter- ests, so that while the dealers in one commodity would make,

the other dealers would lose by its continuance in business. Under these circumstances would a dissolution be beneficial to the interests of the stockholders, within the meaning of the statute? The benefit meant is a pecuniary benefit, either direct or indirect. The exchange cannot be carried on so as to be of material use to any one without the annual expenditure of a large sum of money, to be taken from the surplus, or raised by compulsory assessment, as the by-laws provide. Is it to be expected that the majority, having full control of affairs, will conduct the business efficiently at an actual loss and without any benefit to themselves? The history of the corporation in question shows that while it maintains its organization, keeps open rooms and furnishes some facilities for the transaction of business, they are utterly inadequate to an effective exchange, and that as now conducted it is of no appreciable benefit to any one. It is practically a failure, because, owing to diversity of views and interests, it does not accomplish the object for which it was formed. Is there any reason to expect an improvement if this proceeding is dismissed? None, in the nature of affairs, because the majority will not and cannot be compelled to tax themselves to the extent necessary to maintain an adequate and useful exchange. If they can be forced to maintain an exchange, they cannot be forced to maintain an efficient exchange, as they can lawfully refuse to raise or expend enough money for that purpose. If they see fit to reduce expenses by hiring cheap rooms, furnishing poor facilities, dispensing with cable telegrams and reliable tea standards, both of which cost a good deal, the law cannot interfere, because it has committed control of such matters to the trustees, elected by the votes of a majority of the members. So action in state and legislative matters, daily calls of merchandise, the making and enforcement of rules to settle disputes, establish warehouse charges and govern the issue of tea certificates, together with all of the benefits accruing to the tea merchants from an enterprising exchange, are necessarily under the control of the majority, who cannot be compelled to be liberal, zealous or wise. All questions relating

to the management that call for the exercise of judgment or discretion, must be decided by the trustees or members, acting through a majority. Hence an association that is useful to one class of its members, but injurious to another, will be useless to both, as long as the latter is in control.

We think that when the interests of the stockholders of a corporation are so discordant as to prevent efficient management and a large majority of both trustees and members wish to wind up its affairs, a dissolution thereof will be beneficial to the interests of the stockholders, because the object of its corporate existence cannot be attained. (*In re Niagara Ins. Co.*, 1 Paige, 258; *In re Woven Tape Skirt Co.*, 8 Hun, 508; *Webster* v. *Turner*, 12 id. 264; *Denike* v. *N. Y. & R. Lime & Cement Co.*, 80 N. Y. 599, 605; 2 Beach on Private Corporations, § 781; 1 Morawetz on Corporations, § 413; 2 Waterman on Corporations, § 420; 2 Spellman on Corporations, § 1012.)

Under such circumstances it is better for all that a dissolution should be ordered, so that the minority may reincorporate upon some more practicable basis, if they so desire, and the majority may no longer be forced to keep up a feeble and useless organization, in which they take no interest and from which they derive no benefit.

We are of the opinion that the determination of the learned judges of the General Term was right and that their order should be affirmed, with costs.

All concur.

Order affirmed.