PAINE *v.* SAULSBURY.

CORPORATIONS—DISSOLUTION—STATUTES.

> Where, on appeal by minority stockholders from a decree
> of the court below, granting the dissolution of a mining
> corporation, under sections 13563, 13577, 3 Comp. Laws
> 1915, it appears that it is a solvent, prosperous, going con-
> cern with a large cash surplus, and it does not appear to
> be the intention to discontinue the business of mining
> and distribute its assets among the stockholders, but the
> effect would be that a holding corporation would acquire,
> by force of dissolution, the stock of the minority stock-
> holders, which it was unable to acquire by purchase in
> the open market, the decree of the court below will be
> reversed. FELLOWS, J., dissenting.

Appeal from Houghton; O'Brien, J. Submitted
June 15, 1917. (Docket No. 50.) Decided March
27, 1918.

Petition by William A. Paine and others for the
dissolution of a mining corporation. From a decree
for petitioners, Willard E. Saulsbury and another,
minority stockholders, appeal. Reversed.

*Stone, Wieder & Schulte* (*Dan H. Ball,* of counsel),
for petitioners.

*J. F. Hambitzer* and *Hugh M. Morris,* for appel-
lants.

BIRD, J. In pursuance of a resolution adopted by
the directors of Trimountain Mining Company, they
filed their petition in the Houghton circuit court, on
October 25, 1916, praying for an order dissolving said
corporation. The resolution is as follows:

"Whereas, the average annual net earnings of this
company for the 14 years next preceding the present
year have been only $2.22 for each share, without
making any deduction for depletion of the mineral
deposits in its mine;

"And, Whereas, the Copper Range Company, operating mines adjoining that of this company, is the holder of more than 99/100 of the capital stock of this company, and has offered to buy from the holders thereof the remainder of said stock and to issue in payment therefor, an equal number of shares of its own stock, which offer the holders of said stock refuse to accept, although the net earnings of the Baltic mine, one-half of the net earnings of the Champion mine, and the net earnings of the Copper Range railroad, all of which belong to said Copper Range company, have been, for said 14 years previous, and still are, nearly twice as much per share as the net earnings of this company;

"And, Whereas, said Copper Range Company has offered, and still offers, to bind itself to bid for the mine and property of this company, in case of dissolution and public sale of its property, the sum of $6,000,000, amounting to $60 per share of its capital stock;

"And, Whereas, the earnings of this company as aforesaid, amount to only 3 7/10 per cent. per annum on the sum that would be realized on such sale, if made on the bid of said Copper Range Company, and will cease with the exhaustion of the mine, while the money so realized on such sale would yield at least 5 per cent. interest in perpetuity, thus yielding a larger annual return in perpetuity to each stockholder than can be realized by them from the operation of the mine for only a limited period;

"And, Whereas, this company has no railroad for the transportation of its rock to stamp mill, and is dependent upon the Copper Range railroad therefor;

"And, Whereas, the stamp mill of this company has been destroyed by fire, making it necessary to build a new mill, at an expense of about $500,000, if it continue to operate its mine, or to pay for the treatment of its rock, in either case materially reducing its earnings, at least until a new stamp mill can be built;

"Therefore, Resolved that the directors of this company deem it highly beneficial to the stockholders that it should be dissolved, and that its mine and other property be sold under decree of court and that the proceeds thereof be distributed among the stockholders."

Saulsbury and Foley, the respondents, answered, denying certain conclusions stated in the petition, and denying that the resolution of the board and petition contain sufficient reasons why the company should be dissolved. And they charge that because of interlocking directors in the Trimountain and Copper Range companies, the directors of Trimountain company were in no position to act or vote on the foregoing resolution.

At the hearing some additional facts to those set up in the petition were shown, which are in substance:

(a) That respondents bought their stock consisting of 300 shares as an investment prior to the year 1900, and they have ever since held it as an investment, believing that it was a good investment, and are desirous of retaining it.

(b) That four of the directors of Trimountain company are directors and constitute a majority of the board of directors of Copper Range company. That the four directors have only nominal interests in the Trimountain but have large investments in Copper Range.

(c) That the Trimountain Mining Company produced 8,302,896 pounds of refined copper in the year 1915, and 8,720,000 pounds in the year 1916.

(d) That the company's net earnings in 1915 were $654,746.52, and that it earned over 12 per cent. in 1916, and no dividend was paid in either year.

(e) That at the time of the hearing its cash surplus over and above its indebtedness amounted to approximately $2,000,000, which stood to its credit in a Boston National bank.

(f) That the outlook for the production of copper is very promising and the price received therefor higher than for many years.

(g) That within recent years the mine has been developed and is now fully equipped with modern iron

shaft houses, boiler houses, stores, mine residences
and' numerous other buildings at its stamp mill site
and at its mine site, and that the mine has been sunk
to a considerable depth and miles of drifting has been
done through the lode to develop and locate the cop-
per deposits.

(*h*) That Copper Range Company is not a mining
corporation but a holding company, owning at the
present time all of the Baltic, one-half of the Cham-
pion, and all of the Trimountain except the 300 shares
owned by respondents. That it also owns all of the
stock of the Copper Range railroad.

These proceedings are statutory and are dependent
upon chapter 40 of the judicature act (Act No. 314,
Pub. Acts 1915, 3 Comp. Laws 1915, §§ 13563-13577).
This law first came into our statutes by force of Act
No. 56 of the Laws of 1839, and has remained with-
out substantial change until the present time. The
principal use made of the statute during the interven-
ing years has been to aid in dissolving corporations
that were insolvent, or in failing circumstances, or
where the object for which they had been incorporated
was at an end. The act is now invoked to aid in
dissolving a solvent corporation, a prosperous going
concern with a large cash surplus. These circum-
stances make it incumbent upon the court to examine
the reasons stated in the petition for dissolution with
much closer scrutiny than it would had the question
of insolvency or threatened insolvency been involved.
(*White* v. *Kincaid,* 149 N. C. 415, and cases cited.)

That part of the act calling for construction is sec-
tions 1 and 4.

"SECTION 1. Whenever the directors, trustees or
other officers having the management of the concerns
of any corporation, or the majority of them, shall
discover that the stock, property and effects of such
corporation have been so far reduced by losses or
otherwise, that it will not be able to pay all just de-

mands to which it may be liable, or to afford a reasonable security to those who may deal with such corporation, or whenever such directors, trustees or officers, or a majority of them, shall, for any reason, deem it beneficial to the stockholders that such corporation should be dissolved, they may apply by petition to the court of chancery for the county wherein said corporation is located for a decree dissolving such corporation, pursuant to the provisions of this chapter: *Provided,* that the provisions of this chapter shall not extend to any incorporated library or lyceum society; to any religious corporation; to any incorporated academy or select school not organized for pecuniary profit; nor to the proprietors of any burying ground incorporated under the laws of this State."

"SECTION 4. On the day appointed in such order such court or circuit court commissioner shall proceed to hear the allegations and proofs of the parties and shall take testimony in relation thereto, and in case of a circuit court commissioner shall, with all convenient speed, report the same to the court with a statement of the property, effects, debts, credits, engagements and conditions of such corporation. Upon said hearing before the court or upon the coming in of the report of the circuit court commissioner, if it shall appear to the court that such corporation is insolvent or that for any reason a dissolution thereof will be beneficial to the stockholders and not injurious to the public interest, a decree shall be entered dissolving such corporation and appointing one or more receivers of its estate and effects; and such corporation shall thereupon be dissolved and shall cease." * * *

Both counsel have devoted much space in their briefs to the precise physical and financial condition of the Trimountain company; also its relative value to the Copper Range company. The purpose of petitioner in so doing was to show that the offer of exchange made to respondents was a fair and equitable one. From the same data respondents' counsel argue that the offer is inequitable and unfair. We shall not attempt to follow counsel in these discussions, but will content ourselves with the conclusion, which is amply support-

ed by the testimony, that the Trimountain company which is sought to be dissolved is a solvent corporation, a prosperous going concern, earning large dividends at the present time and capable of earning a reasonable return on the capital invested for many years to come.

Counsel are not in accord as to the power of the court to inquire into the motive of the directors in asking for a dissolution under a statutory provision like the present one. The rule of construction in such cases has been stated as follows:

"At the present time there are statutory provisions in many jurisdictions in this country and in England which expressly provide for the voluntary dissolution of business corporations at the instance of the directors, usually with the consent of a certain proportion of the stockholders. Such a statutory provision enters into every charter, and every stockholder takes and holds his stock subject to this power of voluntary dissolution, and when the board of directors have determined, in their best judgment, that the corporation should be dissolved, and are pursuing the methods specified by the statute, it is only in rare and exceptional cases that their action will be stayed or interfered with by the courts. On the other hand, if it clearly appears that the action is in bad faith, that the resolution for dissolution has been superinduced by undue influence or fraud, or if it is clearly established that the resolution was not taken for the benefit of the corporation or in furtherance of its interest, but for the mere purpose of unjustly oppressing the minority of the stockholders, or any of them, and causing a destruction or sacrifice of their pecuniary interests or holdings, giving clear indication of a breach of trust, such action may be restrained." 7 R. C. L. p. 709, citing *White* v. *Kincaid, supra.*

In the last case cited, after stating the foregoing rule, it is observed that:

"Such cases almost invariably arise when the management of a solvent concern, going and prosperous,

ceases operations and determines to dissolve and sell out, with a view of continuing the same or similar business under different control, and when there is indication given that the sole purpose was to oppress some of the stockholders and confiscate their holdings, or when it is done in furtherance of some scheme to promote the pecuniary interest of the actors, and to the detriment of the corporation, giving indication of a breach of trust on the part of the authorities in charge and control of the corporate affairs."

The testimony of directors Paine and Denton, together with the frankness of counsel, are very persuasive that the sole purpose of the application is to get rid of respondents as stockholders and acquire their holdings, and that, had the Copper Range company been able to purchase or exchange its own shares for respondents' holdings, the petition would never have been filed. The testimony of Mr. Paine shows that the Copper Consolidated Company, a New Jersey corporation, and predecessor of the present Copper Range Company, began to acquire Trimountain mining stock in the year 1903; that in that year a large amount of stock was acquired by exchange of shares. That the offer was renewed in the year 1915 in order to acquire the balance of the outstanding stock, the offer being to exchange Copper Range stock for Trimountain stock, share for share, and that all of the stockholders of Trimountain accepted the offer save these two respondents. Upon this phase of the case a portion of the cross-examination of Capt. Denton is interesting. He testified that:

"The matter of dissolving the Trimountain Mining Company was talked over by the directors of the two companies. It would be mutually advantageous and I presume would be the better way to get the outstanding stock. We were advised that that would be the better way to get the outstanding stock. Buy the whole thing. I think that is it essentially, we advised the directors of the Copper Range and the directors

of the Trimountain that it would be a good plan.  It was a mutual arrangement made at one time.  We only had to see the directors of the Copper Range, only had to see two of the directors of the Trimountain who were not on the Copper Range directorate. Four of us are directors on the Trimountain and Copper Range.  The majority of the Trimountain directors were directors of the Copper Range and were dealing with the Trimountain as directors of the Copper Range with themselves as directors of the Trimountain.  That was the situation.  *  *  *  Yes, it is still the desire of the Copper Range to acquire title to the Trimountain and I have encouraged the action of the Trimountain directors.

"Q. But you do know the Trimountain can be made a profitable mine?

"A. I think we have made it profitable.

"Q. You have made it profitable already, and were it not for the fact that the Copper Range Company desired it in connection with its own operations, if it stood alone without any mine near it, you would still think it a mine that could be profitably worked if well managed?

"A. Certainly, it is a profitable mine and should be operated.

"Q. That is standing alone and without anything else, you would not think it should be dissolved and the proceeds divided?

"A. Not standing alone.  It should be operated."

We, therefore, have before us a petition to dissolve a corporation under the statute in order that a holding company, another corporation, may acquire, by force of dissolution proceedings, what it has been unable to acquire by purchase or exchange in the open market.  It does not appear to be the intention to dissolve the corporation and discontinue the business of mining and distribute its assets among the stockholders, because beneficial to them, nor does it appear to be desired because of any inherent physical or financial weakness in the organization or its property, but it appears to be desired for the reason that the Copper

200—Mich.—5.

Range Company may become the owner of all the shares instead of a portion of them. The idea back of this desire is said to be that the cost of operation can be materially reduced if the property can be operated as a unit with Baltic and Champion. This may be so and perhaps is commendable as a business proposition, but it, is no measure of respondents' rights. The respondents made their investments when the mine was more or less of a speculation. They have been loyal and retained their investments through the years of physical development and financial vicissitudes, and now when the project has proved to be a success, if counsel's contention is to prevail, they may be driven out by a forced sale of their investment for no better reason than that a larger stockholder desires to acquire it in the interest of economy. It is not conceivable that the legislature ever intended that the statute should be used for such a purpose. To give the statute this construction would open the way to the majority interest of every corporation in the State to dispose of an offensive minority in the same way if it saw fit. Such a construction would be injurious to the public interest and not beneficial to the stockholders as a whole. For a similar case upon the law and facts and one which answers many of the arguments of the petitioner in this case, see *Theis* v. *Gas Light Co.*, 34 Wash. 23.

Counsel have argued the second contention of respondents that the petition is of no legal force because after the four interlocking directors had sat around the Copper Range table and determined that it was for the best interest of the Copper Range company to acquire all the shares of the Trimountain company, they were in no position, mentally, to gather around the Trimountain table and determine what was best for that company. As our view of the first question disposes of the case it will be unnecessary to consider

this one further than to say that the action of the directors in this respect has contributed to our conviction that the application is not a good faith application under the statute.

The order of the trial court must be set aside and the prayer of the petition denied. Respondents will recover their costs in both courts.

BROOKE and KUHN, JJ., concurred with BIRD, J.

OSTRANDER, C. J. The peculiar facts in this case lead me to concur in the result reached by my Brother BIRD.

MOORE and STEERE, JJ., concurred with OSTRANDER, C. J.

FELLOWS, J. (*dissenting*). I do not agree with the conclusion reached by Mr. Justice BIRD in this case. As I conclude that the decree appealed from should be modified and affirmed it becomes necessary to notice the legal objections made to it. These objections are two and only two in number:

*First.* That a solvent corporation may not be dissolved under this statute.

*Second.* That these proceedings must fail because a majority of the Trimountain board of directors are also directors of the Copper Range.

I think it unnecessary that we decide the frequently mooted question of whether a court of equity has the inherent power, independent of the statute, to order the dissolution of a going concern. The courts are not in entire accord on this question, and many of the authorities cited by defendants are cases where individual stockholders have sought by bill in equity to take the management of solvent concerns out of the hands of the board of directors, place them in the hands of a receiver, dissolve the company, and wind up its affairs through the courts. With reasonable

unanimity it has been held that only in exceptional cases may this be done. I think, in the consideration of these cases, we should constantly keep before us the manner in which the question has arisen, lest we are led to believe that the trend of decision is against the power of a court of equity to dissolve a solvent corporation, and overlook the fact that in these cases the court is dealing with its inherent power and not with a power conferred upon it by statute, and where the proceedings are instituted by the managing board of the corporation. Nor should we, on the other hand, follow that line of cases cited by the plaintiffs, where the courts have held that when the statute required a dissolution on the vote of a certain percentage of the stockholders, the right to dissolve is absolute on the requisite percentage of stockholders casting their votes for dissolution, irrespective of the motives of the stockholders. Neither of these two lines of cases is controlling here. Under this statute neither the stockholders in any percentage, nor the board of directors have the power to dissolve the corporation. The sole power of the managing board, as we shall presently see, is to initiate the proceedings. The power, and the only power, to dissolve rests in the court and it rests nowhere else. The court may decree dissolution if the corporation is insolvent, but this is not the limit of its power. It may also decree dissolution if *"for any reason* a dissolution thereof will be *beneficial to the stockholders* and not injurious to the public interest."  The court may dissolve in case of insolvency, and it may also dissolve when beneficial to the stockholders, whether insolvency exists or not.

"Beneficial to the stockholders." Does this contemplate that the court may not act and ought not to act where it is beneficial to over 99 per cent. of the stock? Where this per cent. of stock will be greatly benefited and the rights of the balance may be fully protected,

simply for the reason that the small minority object, and object for no more substantial reasons than are given in the evidence offered by them, that they have held the stock a long time and do not want to exchange it for Copper Range and want the Trimountain to continue as a separate company.? I think not. One who purchases stock in a corporation buys it knowing that it is subject to all the laws of the State, including the one under consideration. An examination of some of the authorities will be helpful. We naturally turn to the New York cases first, as our statute is taken from that State. In the case of *In re Niagara Ins. Co.,* 1 Paige, 258, the owners of three-fourths of the stock favored the dissolution, one-ninth opposed it and the balance were indifferent. The chancellor ordered the dissolution and announced the rule which was to guide in such cases, in the following language:

"The court is not bound to decree a dissolution merely because a majority of the directors and stockholders request it to be done. But when the owners of a very large proportion of the stock find it for their interest to vest their capital in something more productive, it is strong evidence that the interest of the stockholders generally will be promoted by allowing them to withdraw their capital and discontinue the business of insurance. In such a case, the particular interest of the few must give way to the general interest of the many."

In *Hitch* v. *Hawley,* 132 N. Y. 212, the statute was under consideration and it was said by the court:

"Where, however, a majority of the trustees favor dissolution 'for any reason,' whether relating to the management or not, and it appears that 'for any reason' a dissolution 'will be beneficial to the interests of the stockholders and not injurious to the public interests, the court must make a final order dissolving the corporation.' As it is not claimed that the public interests are here involved, the only question is whether the facts permitted the conclusion that a dissolu-

tion would benefit the stockholders. * * * The benefit meant is a pecuniary benefit, either direct or indirect."

This case is also authority to the point that the opinion of the owners of a majority of the stock is of prime importance.

A very interesting and recent case is *Bowditch* v. *Jackson Co.,* 76 N. H. 351, where several of the questions here involved are discussed. Mr. Justice Peaslee, speaking for the court, there said:

"The plain common-sense of the matter is that this is a business venture, to be carried on as such so long as it appears to be good business judgment to do so. When the time comes that a majority in interest believe that their affairs should be wound up and the proceeds distributed, the rational rule is that this should be done. And since the question here is of a business nature, and the limitations of the power of the majority are fixed by the understanding of the business men who made the original compact, business considerations have more than ordinary weight in determining what the contract was."

Speaking on the question of the power to dissolve a solvent corporation, he said:

"If the majority may sell to prevent greater losses, why may they not also sell to make greater gains? Bearing in mind that this is purely a business proposition, with no public rights or duties involved, there seems to be no substantial difference between the two cases, as a matter of principle. In each case, the sale is made because it is of advantage to the stockholders."

In *State* v. *Woolen Mills Co.,* 115 Tenn. 266, the court dissolved a solvent corporation, one just organized and before it had entered upon its business. I quote the syllabus:

"A majority of the stockholders in a private business corporation may voluntarily surrender the charter, and abandon, discontinue and dissolve the corpo-

ration upon terms of equality to all stockholders over the protest of the minority stockholders before the corporation had purchased any property, incurred any debts, or accomplished anything more than a temporary organization, and where it appears that the stockholders would not be materially prejudiced or financially injured by the dissolution and discontinuance, except as to prospective and speculative profits; and the dissolution will be decreed by the court in a proper suit for that purpose in order to avoid future complications and possible liabilities."

See, also, *Treadwell* v. *Salisbury Manfg. Co.*, 7 Gray, 393; *Trisconi* v. *Winship*, 43 La. Ann. 45.

The case of *White* v. *Kincaid*, 149 N. C. 415 (23 L. R. A. [N. S.] 1177), cited by my Brother BIRD, was a bill filed by an individual stockholder to restrain dissolution of a solvent corporation by its board of directors. The court declined this relief. I quote the syllabus:

"The courts will not, save in rare and exceptional instances, interfere at the suit of minority stockholders of a corporation with proceedings of a majority to dissolve it as authorized by statute."

I think the case of *Theis* v. *Gas Light Co.*, 34 Wash. 23, also cited by my Brother BIRD, is clearly distinguishable from the instant case. In that case, without any benefit to any one, the old corporation was dissolved and a new one created to get rid of plaintiff, the owner of 8 shares of stock, who was styled an uncongenial minority stockholder. In the instant case, as I shall presently discuss, the owner of 99.7 per cent. of the stock of the Trimountain will be benefited to the extent of many thousands of dollars. Indeed, the opinion of Mr. Justice BIRD concedes it to be "commendable as a business proposition," but thinks it does not measure defendants' rights. Reliance is had in the *Theis Case* on section 670, 3 Cook on Corporations (7th Ed.), and *Kean* v. *Johnson*, 9 N. J. Eq. 401. An

examination of Mr. Cook's work shows that the section there relied upon is found in the chapter on "*Ultra Vires* Acts and Contracts," where the author was considering the power of the directors to sell all the corporate property, while in the chapter on "Dissolution," he says:

"There has been much doubt as to whether minority stockholders may prevent a dissolution under a statute, where the purpose is to sell the property to another company. The weight of authority seems to hold that such a dissolution is legal, if no actual fraud is shown and if a public sale of the property is provided for." 2 Cook on Corporations (7th Ed.), § 629.

The New Jersey case cited in the *Theis Case* was considerably weakened by what was said by the same court in *Black* v. *Canal Co.*, 22 N. J. Eq. 130 (see p. 404). I do not think the *Theis Case* should be followed under the facts in the instant case.

It is fair to assume that upon a receiver's sale of the Trimountain property, in all human probability the Copper Range company will be the purchaser. This company, by reason of the situation, can afford to pay more for it than any other company or any individual. The Trimountain lies between two of its subsidiary companies, the Baltic and Champion. By doing this the overhead expense of maintaining duplicate organizations, a very large sum under existing conditions, may be avoided. It appears that the Baltic has a capacity at its stamp mill to accommodate the output of the Trimountain, and by a dissolution the expense of building a stamp mill on the Trimountain will be saved. It is admitted that this expense would be at least $500,000. Of this sum the majority stockholders would have to pay nine hundred and ninety-seven one-thousandths, or $498,500, while defendants would have to pay but $1,500. Are the rights of these minority contestants of such overweening and

paramount importance as to justify a court of equity
in laying upon the majority stockholder this enormous
and wholly unnecessary expense in order that they may
continue to hold the stock in the Trimountain instead
of having the full value of such stock paid them in
cash to be used for other investment? In other words,
are the rights of these 3/10 of one per cent. of the
stock of this corporation so sacred that the other 99
7/10 per cent. must expend nearly half a million dol-
lars in order to keep the old company intact? Is a
court of equity justified in requiring this useless ex-
pense of half a million of corporate funds? I think
not. There are 100,000 shares of stock in the Tri-
mountain company; the Copper Range owns 99,700 of
them, defendants 300. If this entire stock was held
equally in 100 share blocks there would be 1,000 share-
holders. If such were the case would a court of equity
turn a deaf ear to 997 of the shareholders if they
were asking a dissolution in the interest of economy
in management, economy in the expenditures I have
noted and others which might be mentioned, and listen
only to the three shareholders who might desire, as
a matter of sentiment, to keep the old company going,
to say nothing of the opportunity for holding up the
majority stockholders, thus exacting a fancy price for
their fraction of one per cent. of stock? What dif-
ference is there in the underlying principle, whether
the majority of the stock is held by 997 shareholders
or by one? None whatever. It appears beyond ques-
tion, upon this record, that it is beneficial to the over-
whelming majority of the stock that this dissolution
take place.

I am persuaded that defendants would also be bene-
fited by a dissolution of this company, and the sale
of its property at the present time. It is a good time
to sell property when there is an anxious purchaser
ready to buy. This record discloses that the copper

industry is now enjoying an unprecedented era of prosperity. How long this will continue no one can foretell. This property is now actually worth and will sell for more cash than ever before in its history. We are dealing with a business proposition, not with theories or speculation; with pecuniary interests, not with sentiment. I am clearly of the opinion from this record that the interests of all stockholders will be benefited by a sale, under such circumstances as will protect the interests of all.

The directors are the trustees for all the stockholders, minority as well as majority, and their actions must be scrutinized and examined with that relation in view. As defendants contend, they may not, as such trustees, sell to themselves all the corporate property, nor may they sell all the corporate property to any one else. If they were making a sale by themselves to themselves, or to a company in which they were interested, another question would be presented. Neither the company nor the board of directors are selling, or contracting to sell, this property. In this proceeding the court is in fact making the sale. *Peirson* v. *Fisk*, 99 Mich. 43. No sale becomes effective until reported to and confirmed by the court. All the board of directors have done, and all they are authorized to do under this statute, is to initiate the proceedings—to place the matter in the hands of the court. When the sale is finally made it is made by the court. I discover no reason which would prevent the board of directors, trustees for all the stockholders, from initiating these proceedings in a court of equity, and placing the question of a sale of the property in the hands of the chancellor; nor have I been able to discover any place where this board of directors has in any way disregarded their trusteeship, or in any manner neglected the interests of all the stockholders.

This property must be sold for cash. Defendants

cannot be required to take stock in another company. *Lauman* v. *Railroad Co.*, 30 Pa. St. 42; *Francis* v. *Taylor*, 65 N. Y. Supp. 28; *Slattery* v. *Development Co.*, 128 La. 871. Upon such sale an upset price should be fixed. This case has been appealed to this court and we are hearing it *de novo.* I think there is sufficient upon this record from which we are able to fix such upset price. The Copper Range company some years ago offered what would amount to $6,000,000 for this property. I think we may assume that it was then worth that amount. Since that time its surplus has increased until at the end of 1916 it amounted to $2,000,000. The case was tried during the year 1917, so that the figures for that year are not before us, but the record indicates and all seem to agree that it would be a prosperous year. I think that, taking all the facts in the record into consideration, we may fairly fix as an upset price the sum of $10,000,000.

I think the construction here given the statute carries out the legislative intent, protects the rights of all, and will prevent its oppressive use, either on the one hand to "freeze out," as it is called in the *Theis Case,* uncongenial minority stockholders, and on the other prevent hold-ups by owners of small amounts of stock.

I think the decree of the court below should be modified by fixing an upset price of $10,000,000, and in all other regards affirmed. Defendants should recover costs of this court.

STONE, J., did not sit.