In re UNOCAL EXPLORATION CORPORATION SHAREHOLDERS LITIGATION.

No. C.A. 12453.

Court of Chancery of Delaware,
New Castle County.

Submitted: April 7, 2000.
Decided: June 13, 2000.

R. Bruce McNew, Taylor & McNew LLP, Greenville, Delaware, Pamela S. Tikellis, Robert J. Kriner, Jr., Chimicles & Tikellis, LLP, Wilmington, Delaware, for plaintiffs.

Kenneth J. Nachbar, Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Brett D. Fallon, Morris, James, Hitchens & Williams, Wilmington, Delaware, for defendants.

**OPINION**

LAMB, Vice Chancellor.

## I. INTRODUCTION

The plaintiff stockholders in this class action lawsuit allege breaches of fiduciary duty and violations of Sections 11, 12 and 15 of the Securities Act of 1933 in connection with the May 2, 1992 short-form merger of Unocal Exploration Corporation ("UXC") into Unocal Corporation. Trial in this matter was held November 8–10, 1999. The parties submitted post-trial briefs and presented oral arguments on April 7, 2000. This is the court's post-trial decision.

Section 253 of the Delaware General Corporation Law (the "DGCL") allows a corporate parent holding 90 percent or more of each class of another corporation's stock unilaterally to file a certificate of merger eliminating the minority stock interest (a "short-form merger"). The statute neither requires nor contemplates any action by the board of directors or stockholders of the subsidiary to accomplish such a merger. Each minority stockholder of the subsidiary, if dissatisfied with the terms of the merger, may demand a stock

appraisal, pursuant to Section 262(b)(3) of the DGCL.

In 1962, the Delaware Supreme Court held, in *Stauffer v. Standard Brands, Inc.,* that, except in cases of illegality or fraud, appraisal is the sole and exclusive remedy available to minority stockholder in connection with a short-form merger. As Justice Southerland said in that case:

> [I]t is difficult to imagine a case under the short merger statute in which there could be such actual fraud as would entitle a minority to set aside the merger. This is so because the very purpose of the statute is to provide the parent corporation with a means of eliminating the minority shareholder's interest in the enterprise. Thereafter, the former stockholder has only a monetary claim.[1]

Although *Stauffer* has not been overruled, more recent Supreme Court decisions involving mergers create some doubt about its continued vitality. This degree of uncertainty is reflected both in the process followed by the defendants in arranging the UXC merger and in the parties' post-trial arguments. For instance, although the statute contemplates a unilateral exercise of power by the parent, Unocal caused UXC to form a special committee of its directors for the purpose of negotiating the terms of the merger. Similarly, plaintiffs argue that the process leading to and the terms of the merger must pass the exacting standard of "entire fairness" ordinarily reserved for reviewing transactions either dependent on the assent of the board of directors of a controlled corpora-

tion[2] or presumptively tainted by evidence of a breach of fiduciary duty.[3]

Based on my review of the record and consideration of the parties' respective legal arguments, I find no basis to conclude that a statutory appraisal was inadequate to address plaintiffs' claims in this case. Because plaintiffs chose not to pursue their exclusive appraisal remedy, I will enter judgment in favor of the defendants.

## II. FACTUAL BACKGROUND

### A. The Parties

Defendant UXC was involved in the exploration, development, production and sale of natural gas and crude oil in the Gulf of Mexico region. Because of its narrow and non-diversified business, UXC was considered a "pure play" in the oil and gas industry. Its shares traded on the New York and Pacific Stock Exchanges. Defendant Unocal indirectly held approximately 96% of UXC's common stock.

On February 24, 1992, Unocal announced its intention to exchange the minority shares of UXC stock for stock in Unocal through a short-form merger pursuant to Section 253 of the DGCL. Plaintiffs Morris I. Glassman and William Steiner filed suit that same day.[4] Besides naming Unocal and UXC as defendants, plaintiffs also named the UXC board of directors, namely; John W. Amerman, Roger C. Beach, MacDonald G. Becket, Claude S. Brinegar, Malcolm R. Currie, Richard K. Eamer, Frank C. Herringer, John F. Imle, Jr., Donald P. Jacobs, Ann McLaughlin, Neal E. Schmale, Thomas B.

---

1. Del.Supr., 187 A.2d 78, 80 (1962).

2. *See e.g., Kahn v. Lynch Communication Systems, Inc.,* Del.Supr., 638 A.2d 1110 (1994); *Kahn v. Tremont Corp.,* Del.Supr., 694 A.2d 422 (1997); *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701 (1983).

3. *See Cede & Co., Inc., v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345 (1993).

4. The consolidated actions are brought on behalf of the former holders of the 4% of UXC stock not held by Unocal prior to the merger.

Sleeman, Richard J. Stagemeier, and Charles R. Weaver (the "Director Defendants").[5] On May 2, 1992, Unocal filed the certificate of merger.

## B. Unocal Decides to Eliminate the UXC Minority

During 1991, oil and gas prices dropped significantly, weakening both UXC's and Unocal's revenues and earnings. Resort to the public markets was deemed to be too expensive an alternative for UXC to satisfy its financing needs. Unocal management believed it feasible to provide UXC with funds, but wanted to eliminate the cost of dealing with the conflict of interest problems presented by the existence of UXC's minority stockholders. The Unocal board therefore proposed eliminating the 4% UXC minority.

## C. The UXC Special Committee is Created

Due to the pendency of other stockholder class action litigation involving UXC, Unocal proceeded cautiously with respect to the contemplated merger. Thus, notwithstanding its statutory power to set the terms of the merger unilaterally, Unocal caused UXC to form a committee of its directors (the "UXC Special Committee") for the purpose of "negotiating" the merger price on behalf of the UXC minority.[6] Because all of the UXC directors were also directors of Unocal, the UXC board chose three of its members who were independent directors of Unocal, that is, three persons who were not also officers or employees of Unocal. The Special Committee consisted of Ann McLaughlin, as Chairman, MacDonald G. Becket and Charles R. Weaver.[7] These three remained directors of Unocal and, thus, owed fiduciary duties to both Unocal and UXC.

## D. The Special Committee's Efforts

The UXC Special Committee retained PaineWebber to act as its financial advisor and to provide a fairness opinion as of a date reasonably proximate to the merger.[8] The Committee also retained the Delaware law firm of Smith Katzenstein & Furlow, LLP as its legal advisor. The parties argue about Unocal's involvement in the selection of advisors.[9] Plaintiffs also claim that PaineWebber's "contingent" fee struc-

---

5.  Recognizing that (1) a short-form merger could rarely, if ever, be preliminarily enjoined, (2) the plaintiffs sought exclusively monetary relief and (3) any disclosure defects bearing on the stockholders' decision of whether to seek appraisal could be remedied by a "quasi-appraisal" proceeding, Chancellor Allen denied plaintiffs' motion for expedited discovery. *Glassman v. Unocal Exploration Corp.*, Del.Ch.C.A. No. 12453, Allen, C. (Feb. 28, 1992) (Transcript).

6.  While the Special Committee was actually asked to consider alternatives to a merger, it is not seriously contended that Unocal would have accepted a different course.

7.  McLaughlin, who had previously served as U.S. Secretary of Labor and Undersecretary of the Department of the Interior, acted as an outside director on numerous boards, includ-

ing: AMR Corp., General Motors Corp., Kellogg Company and The Travelers Companies. Weaver was Chairman and CEO of the Clorox Company. Becket was on the board of the National Institute of Building Sciences and had served as Chairman and CEO of The Becket Group, a major architectural and engineering firm.

8.  Unocal selected Goldman Sachs & Co. as its financial advisor with respect to the merger.

9.  Although I find this factual dispute immaterial to the case, I note that although defendants argue that McLaughlin selected PaineWebber because of an existing relationship with its CEO, the Information Statement indicates that "Unocal recommended PaineWebber to the UXC special committee." DX 11 at 13.

ture [10] and interest in obtaining future business from Unocal renders its opinion suspect.[11]

McLaughlin did nearly all of the spadework for the Committee, holding several early meetings with Unocal and Paine-Webber representatives to discuss the valuation of UXC and related issues. The UXC Special Committee formally met four times, on February 11, 18, 20 and 23, before the February 24, 1992 announcement of the merger. Each Committee member attended these meetings.

On February 10, 1992, UXC publicly announced the test of a natural gas well on what was called Mobile Block 904. The announcement indicated that Block 904 was significant in terms of future profitability. At the UXC Special Committee meeting the next day, however, HD Maxwell, UXC's then-President and CEO, stated that Block 904 would not add to UXC's reserves in the near future and that there existed no present plan to develop it. Maxwell further stated that Block 904 would not have a material impact on UXC's value.[12]

Plaintiffs argue that Mobile 904's value amounted to about 10–12 cents per UXC share.[13] Moreover, plaintiffs claim that Unocal did, in fact, have a plan to develop Mobile 904 and Maxwell's statement to the contrary constituted an affirmative misrepresentation to the Special Committee, later repeated in the disclosure to UXC's stockholders.

At the various meetings of the UXC Special Committee, valuation issues were discussed and negotiating strategies considered.[14] Unocal's initial "offer" was to give UXC stockholders 0.5 share of Unocal for each share of UXC, representing a 15% premium for UXC's minority stockholders. PaineWebber later indicated that an appropriate exchange ratio, accounting for comparable transactions, dividend differentials, and other factors, would be in the 0.53 to 0.55 range.

At the February 23 meeting, the Special Committee decided that it would accept, at a minimum, a 0.54 exchange ratio but would seek 0.55 Unocal shares or better for each UXC share held by the minority stockholders. McLaughlin proposed the 0.55 exchange ratio to Sleeman, but his reaction was quite negative.[15] McLaughlin

10. Plaintiffs claim that PaineWebber's "contingency fee" ($600,000 if it rendered an opinion or $150,000 if it did not) makes its work unreliable. Nothing about the compensation arrangement compelled or gave Paine-Webber a direct incentive to render a *favorable* opinion. Indeed, it would be paid the same $600,000 whether its opinion was favorable or not.

11. Plaintiffs point out that in April 1992, PaineWebber made an effort to solicit underwriting business from Unocal. The record further reveals, however, that PaineWebber's contact with Unocal was part of a routine solicitation of many potentially interested companies and was, in any event, unsuccessful.

12. As was later explained to the UXC Special Committee, UXC's stock price rose only half a point on the day of the announcement, indicating the market's view that the find would not have a material impact on UXC's future prospects.

13. Relative to the ultimate $13.77 worth of Unocal stock received by UXC stockholders, even plaintiffs cannot contend that Mobile 904 materially added to UXC's value.

14. Plaintiffs' argument that the Special Committee improperly "did not consider anything other than a transaction with Unocal" is creative, albeit not meriting further discussion beyond recognizing that few outside parties would seek to purchase the 4% minority interest.

15. Defendant Sleeman, as a member of Unocal's executive committee, handled the negotiations on behalf of the parent.

then lowered the Special Committee's "demand" to 0.54, which Sleeman presented to the Unocal executive committee.

After the Unocal executive committee endorsed the 0.54 exchange ratio, Unocal and UXC issued a press release on February 24, 1992, announcing that Unocal would eliminate UXC's minority shareholders by virtue of a merger to be completed by May 2, 1992, "subject to usual terms and conditions." [16] Applying the February 21, 1992 market prices for Unocal and UXC stock ($21.63 and $9.88, respectively), the minority stockholders would receive Unocal stock worth $11.68 for each of their UXC shares. Plaintiffs filed suit the same day.

The resolution passed by the UXC board on February 24 explains the merger terms as follows: Unocal would register and issue common stock, to be exchanged at a ratio of 0.54 Unocal share for each 1.0 UXC share; if the publicly traded price of Unocal stock fluctuated more than 20 percent from its February 21, 1992 closing price between the announcement date and the closing date of the merger, either party would have the right to seek to renegotiate the terms of the merger; UXC's minority stockholders would be given a right to appraisal; and the merger would be consummated after the United States Securities and Exchange Commission declared effective the registration statement for the issuance of Unocal shares and all requirements of § 1110 of the California Corporation Code and § 253 of the DGCL were satisfied.

## E. The April 29, 1992 PaineWebber Letter

PaineWebber's formal opinion, dated February 24, 1992,[17] that the short-form merger was fair to UXC's minority stockholders, was based on preliminary year-end financial statements and estimates of 1991 year-end reserves for Unocal and UXC. In light of the two month delay in consummating the merger, the Committee asked PaineWebber to review (1) the Form 10–Ks filed by UXC and Unocal, containing the audited year end-financials for both corporations, (2) the preliminary first quarter results of UXC and Unocal, and (3) estimated future production and costs of Unocal's oil and gas reserves. PaineWebber was not asked to review or consider any additional information and specifically disclaimed any view as to whether additional information or analyses might have affected its prior opinion. In connection with its supplemental inquiry, PaineWebber made a presentation to the Special Committee on April 21, 1992, and delivered a letter dated April 29, 1992, which was disclosed in its entirety to the stockholders, explaining the nature and result of its additional efforts.

The heart of plaintiffs' argument as to value is that a rise in gas prices in the first quarter of 1992 affected the fairness of the merger consideration because UXC's market value (as a "pure play") should have grown at a greater pace than did its diversified parent. As part of its April 21 presentation to the Special Committee, PaineWebber revised its discounted future net

---

**16.** Although the release explained that Unocal held 96% of UXC's stock, it did not specifically state that the merger would be completed pursuant to § 253. As such, the plaintiffs apparently anticipated that a formal merger agreement would be executed.

**17.** Plaintiffs point out that the final version of the fairness opinion was only circulated on March 6, 1992 and formally approved on March 9, 1992. Plaintiffs do not allege that the content of the final opinion differed from the substantive information already provided to the UXC Special Committee prior to February 24, 1992.

revenue analysis. It did not revise any of the other valuation analyses it performed in connection with the February 24 Opinion. This revised valuation used audited year-end 1991 data and applied the lower gas prices of that time period.

PaineWebber's Kevin McCarthy (who appeared as defendants' valuation expert at trial) appeared before the Committee and gave the updated analysis.[18] The minutes of that meeting state:

> Mr. McCarthy explained to the Committee that PaineWebber viewed the discounted net revenue calculation as the most reliable calculation for purposes of determining net asset value. He further explained that the lower valuations reflected the fact that the calculations were based on year-end pricing.... Mr. McCarthy also indicated that there had been an increase in oil and gas prices [since year end] such that if the discounted future net revenue calculations were done today, it would result in a higher value than at year end.

> Mr. McCarthy stated that the revised calculations did not affect Paine-Webber's fairness opinion. Net asset value is only one of the methodologies used to value both companies, and even using the revised numbers, the exchange ratio was still at the indicated mean value with a premium ...

> Following discussion, all members of the Committee agreed that the revisions to the net asset value calculations were not material in the overall context of PaineWebber's analysis, and did not al-

ter the Committee's conclusion that the existing exchange ratio was fair.[19]

## F. The Certificate of Merger is Filed on May 2, 1992

On May 2, 1992, Unocal completed the short-form merger, eliminating UXC's minority stockholders. Based on Unocal's closing price of $25.50 on that date, UXC's minority stockholders received $13.77 in consideration for their UXC shares. As required by law, Unocal notified UXC's stockholders of the merger by sending out an Information Statement, indicating the merger terms and the availability of dissenters' rights. The Information Statement included the prospectus for the Unocal stock to be issued in the merger, which contained the full text of PaineWebber's February 24 Opinion and its April 29 letter. *Neither plaintiffs nor any other UXC stockholders pursued a Section 262 appraisal.*

## III. THE PARTIES' CONTENTIONS

Plaintiffs claim that the defendants breached their fiduciary duties in connection with the short-form merger. Plaintiffs assert that the merger was not entirely fair to UXC's minority stockholders as of May 2, 1992 and attack both the "fair dealing" and "fair price" prongs of that test.

In support of their fair dealing claim, plaintiffs attack the Special Committee's lack of independence and criticize McLaughlin's willingness to accept a 0.54 exchange ratio instead of fighting for 0.55. They also call into question defendants'

---

**18.** Specifically, the minutes of that meeting indicate that McCarthy said that based on the requested revision, "the mean net asset value for UXC had declined from $8.96 to $8.67. For Unocal, the mean net asset value had declined from $21.36 to $18.31. As a result, the mean value (based on all methodologies) for UXC went from $9.43 to $9.36, a decline of approximately 0.75%. By comparison, the equivalent mean value for Unocal decreased from $22.60 to $21.61, a decline of approximately 4.4%." PX 62 at 2.

**19.** *Id.* at 3–4.

reliance both on PaineWebber's February 24 Opinion and on its April 29 letter. Specifically, plaintiffs attack the Special Committee's failure to inquire deeper into how increased gas prices affected the fairness of the merger. Also, plaintiffs point out that the April 29 letter, which was attached to the Information Statement delivered to UXC stockholders, failed to disclose either that the discounted future net revenue analysis was revised or that the same analysis with current figures would lead to a higher valuation for UXC.[20]

Plaintiffs also claim that they received an unfair price for their shares. Specifically, plaintiffs argue that the rebound in gas prices in the spring of 1992 affected UXC's value to a greater extent than it did Unocal's value. Plaintiffs argue that certain fluctuations in the stock prices of gas "pure play" companies indicate that the merger ratio was unfair as of May 1992. As is discussed in greater detail below, this argument hinges, in substantial part, on whether Unocal's stock price movement materially diverged from this trend.[21] Plaintiffs conclude that UXC's minority stockholders "should have received at least 10–13% more, or an extra $1.38 to $1.79 per share, in the Merger. The failure to include Mobile 904 in the valuation results in an additional $.10 to $.12 per share." In other words, accepting each of plaintiffs' valuation arguments entirely, the 0.54 ratio was approximately 15% short of "fair value."

Plaintiffs also argue that the Information Statement was materially misleading because it (1) failed to discuss the allegedly material changes in the market that tended to refute the fairness of the merger consideration, (2) failed to explain adequately that PaineWebber only revised one of its analyses when preparing the April 29 letter and had explained to the UXC Special Committee that its revised analysis would have differed if current information were used, (3) omitted material information regarding how the 0.54 exchange ratio was determined, including the fact that 0.54 was the Special Committee's "absolute bottom line" figure, (4) omitted that Paine-Webber believed that an appropriate exchange ratio was in the 0.53 to 0.55 range, (5) stated PaineWebber's compensation arrangement without describing the "contingent" nature of the fee, and, finally, (6) omitted Unocal's alleged plan to commence production at Mobile 904 by January 1994.

Defendants counter by stating, first, that they could have completed the short-form merger without involving the UXC board at all and, second, even if they were under a duty to treat the minority with entire fairness, they satisfied their burden to show that they did so. Defendants further argue that none of the omitted information could have been material to a stockholder.

## IV. ANALYSIS

■ Section 251(b) of the DGCL provides that a 50.1% majority stockholder

---

**20.** The minutes clearly suggest that McCarthy stated that both companies' values would rise in light of higher gas prices. Plaintiffs focus solely on the anticipated rise in UXC's stock.

**21.** Plaintiffs' expert used February 14 stock prices in conducting his analysis of fluctuations in the comparable companies and in the relative movement in UXC and Unocal stock. Plaintiffs explain this choice by noting that certain of the price data considered at the

February 21 Special Committee meeting was current to that date. Defendants point out that February 14 was a temporary low point for Unocal's stock, thus exacerbating the apparent divergence of gas "pure plays" and the diversified Unocal. If one were to consider stock prices as of February 21 or 24, as defendants suggest, these differences are less substantial.

**338**

seeking to purchase the corporation's remaining shares through a merger *cannot complete the transaction* without obtaining the recommendation and approval of the corporation's directors.[22] This procedural hurdle is critical because directors are obliged to make that recommendation in a manner consistent with their fiduciary duties. By exercising control over the corporation's board of directors, the 50.1% stockholder may, *in breach of its fiduciary duties to the minority stockholders,* cause the board, *in breach of their respective fiduciary duties,* to approve a merger that is not fair to the minority stockholders. Delaware law is therefore clear that if a controlling stockholder engages in a long-form merger to eliminate the minority, this court will review the transaction for entire fairness.[23]

In contrast, the plain words of Section 253 of the DGCL granted the Unocal board the power to complete a merger of UXC into Unocal without so much as informing the UXC board of that plan prior to publicly disclosing the same. "This is so because the very purpose of the statute is to provide the parent corporation with a means of eliminating the minority" interest in the subsidiary.[24] In 1972, Professor Ernest L. Folk, III, Reporter for the 1967 revision to the DGCL, understood this to mean that because the subsidiary directors have no role in the short-form merger,

"they need not obtain impartial or independent appraisal of the value of the subsidiary's stock, and since they have no 'rights' with respect to the merger, they have no duties to minority stockholders."[25]

The function and purpose of § 253 is both inconsistent with and undermined by the application of a heightened judicial standard of review, and the concomitant heightened incentive for procedural safeguards, that applies to long-form mergers involving a controlling stockholder. Put simply, long-form and short-form mergers should be subject to a different set of rules because one form of transaction requires the subsidiary board's participation and assent while the other does not. The entire fairness standard of review governs long-form mergers with a controlling stockholder and consists of both "fair dealing" and "fair price." It cannot apply meaningfully to a pure short-form merger, in which no "dealing" is required.[26] Plaintiffs' argument that the entire fairness standard applies, although finding some support in decided cases, contradicts the basic principle that, absent fraud, gross overreaching, or other such wrongful conduct, appraisal is the exclusive remedy to minority stockholders in a short-form merger.

Here, resolution of the exclusivity issue is critical because, if appraisal is the exclusive remedy, plaintiffs' failure to pursue

22.  8 *Del.C.* § 251(b).

23.  *Kahn v. Lynch Communication Systems, Inc.,* Del.Supr., 638 A.2d 1110 (1994) (holding that the use of a special committee or other independent bargaining structure will only shift the burden of disproving entire fairness to the stockholder plaintiff).

24.  *Stauffer,* 187 A.2d at 80.

25.  Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis,* § 253, cmt. 2, 352 (1972).

26.  I recognize that some "short-form" mergers occur as the second step of a two-step negotiated transaction in which a less than 90 percent parent acquires the remainder of the subsidiary's equity. While those mergers may, ultimately, take the form of a Section 253 merger, their terms were the subject of negotiation with the target company board of directors and should, where appropriate, be examined by using the entire fairness analysis.

that appraisal remedy will result in judgment for the defendants.

## A. The Entire Fairness Standard is Inconsistent with the Policies Embodied in Section 253

Plaintiffs argue that because every short-form merger is a self-dealing transaction, the entire fairness standard of review applies.[27] Merely labeling a species of transactions as "self-dealing," however, does not provide a logical basis for applying to them the entire fairness standard of review. Instead, an examination of the statute itself demonstrates that no actual negotiation or *dealing* need take place in a pure short-form merger. Rather, the 90% or greater parent unilaterally sets the merger price, passes a resolution and files a certificate of merger—all without the need to consult or *deal* with the subsidiary, its directors or other stockholders.[28] The minority stockholders have, in every case, the right to seek appraisal in lieu of accepting the merger price.[29]

I recognize that, in this case, Unocal implemented an extra-statutory special committee process in determining the terms of the UXC merger, mimicking the mechanism often used in connection with transactions in which the entire fairness standard applies.[30] Nevertheless, at least where, as is true here, that process was not a sham or one adopted to lull investors into abandoning their appraisal remedy, its use does not alter the form of judicial review.

### 1. *A Brief History of Appraisal, Its Function and Purpose*

In the nineteenth century, corporations could not merge without unanimous stockholder consent.[31] Predictably, this rule (predicated on ideas of stockholders' vested rights in the entity) created significant holdout problems, for example, 1% of the stockholders were able to prevent the other 99% from implementing fundamental changes in the corporation.[32]

---

**27.** Citing, for example, *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Kahn v. Lynch Communication Systems, Inc.*, Del. Supr., 638 A.2d 1110 (1994); *Ryan v. Tad's Enterprises, Inc.*, Del.Ch., 709 A.2d 675 (1996).

**28.** § 253; *see, e.g., Stepak v. Scharffenberger*, Del.Ch., C.A. No. 6530, mem. op. at 7–8, Walsh, V.C., 1985 WL 11579 (Aug. 9, 1985) (recognizing that self-interest and control is, by definition, expected in the context of a short-form merger).

**29.** § 253(d).

**30.** Unocal did so in part due to the pendency of other litigation with the UXC stockholders and in part due to the lack of clarity in our law. That is, it seems likely that Unocal initiated the Special Committee process both in the hope that it would provide a useful mechanism to settle all real and potential claims by UXC stockholders and as a hedge against the possibility that a Delaware court reviewing a

challenge to the merger would consider the fairness of the process pursued as bearing on the entire fairness of the transaction.

**31.** For interesting and informative examinations of the history, utility and deficiencies of the appraisal remedy, past and present, see generally Weiss, Elliott J., *Balancing Interests in Cash–Out Mergers: The Promise of Weinberger v. UOP, Inc.*, 8 Del.J.Corp.L. 1 (1983) (hereinafter "Weiss"); Thompson, Robert B., *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo.L.J. 1 (1995); and Letsou, Peter V., *The Role of Appraisal in Corporate Law*, 39 B.C.L.Rev. 1121 (1998) (hereinafter "Letsou"); Thomas, Randall S., *Revising the Delaware Appraisal Statute*, 3 Del.L.Rev. 1, 17 (2000) (hereinafter, "Thomas").

**32.** *See, e.g., Paine v. Saulsbury*, 200 Mich. 58, 166 N.W. 1036 (1918) (refusing to allow a 99% stockholder to dissolve a corporation because the 1% minority stockholders would not agree).

#### a. Majority rule problems

While state legislatures eventually recognized the overall efficiency of majority rule in the corporate context, they faced problems associated with allowing the majority to make choices that fundamentally altered the risk entailed by a continued investment in the changed entity.[33] Also, it was seen that a majority stockholder, given the power to make investment choices that affect the minority, could exploit that power to misappropriate wealth from the minority.[34]

#### b. Appraisal as an answer

■ The appraisal remedy evolved as a means of balancing the demands for majority rule against the need to protect minority stockholders against illiquidity or misappropriation of value. Thus, when statutes were amended to provide for majority rule in certain fundamental corporate changes, minority stockholders who were dissatisfied with the consideration paid for their shares or unwilling to participate in the changed entity were given the right to a judicial determination of the fair value of their shares.[35] Unlike other stockholder remedies, the appraisal remedy does not depend on a showing of illegality, fraud, bad faith or some other breach of fiduciary duty. A recent commentary states that appraisal's utility may be that it "facilitate[s] the market for corporate control by providing a cheaper method of eliminating shareholders," because those shareholders may seek appraisal instead of pursuing breach of fiduciary duty actions, which are generally more costly and disruptive to the enterprise.[36] As Professor Thomas aptly points out, "[s]uch savings are more likely to occur when appraisal is the shareholders' exclusive remedy." [37]

#### c. Short-form mergers

Section 59A of the DGCL, the predecessor to what is now § 253, was enacted in 1937 and provided for short-form mergers of wholly owned subsidiaries into their parent corporations. By a 1957 amendment, the legislature broadened the statute to include 90% controlled subsidiaries.[38] The statute, as amended, gave minority stockholders an absolute right to demand appraisal of their shares in such transactions.

#### 2. Delaware Law and the Exclusivity of the Appraisal Remedy

In 1959, the Delaware Supreme Court examined the then recently amended cash-out short-form merger statute. Minority stockholders who were being forced to ac-

---

33. *See* Letsou, *supra* note 31, at 1122–25.

34. *See, e.g., Jones v. Missouri–Edison Electric Co.,* 144 F. 765 (8th Cir.1906) (controlling stockholder causes merger of two entities, through which 80% of the stock of the resulting corporation is issued to stockholder's wholly owned corporation, even though the non-wholly owned corporation contributed 81% of the new entity's value, thus misappropriating nearly all of that entity's value from its minority holders).

   The Delaware Supreme Court recently endorsed the view that appraisal's utility is that "shareholders who otherwise gain from appraisal-triggering transactions will only vote in favor of those transactions if their gains more than offset the costs of compensating objectors." *Letsou* at 1123–24, *quoted in Paskill Corp. v. Alcoma Corp.,* Del.Supr., 747 A.2d 549 (2000). I call this the "efficiency concern," and it integrates concepts from both the liquidity and misappropriation concerns.

35. The original Delaware appraisal statute was enacted in 1899 and provided for a three-member panel of appraisers. 21 *Del.Laws ch.* 273, § 56 (1899).

36. Thomas, *supra* note 31, at 17.

37. *Id.* at 18.

38. 51 *Del.Laws ch.* 121, § 253 (1957).

cept cash consideration for their shares brought a claim under § 253.[39] The Supreme Court held that § 253 granted to the 96% parent corporation a specific statutory power to cause a merger and to the minority stockholders a right to an appraisal.[40]

### a. Stauffer and Braasch

Taking the next logical step, the Supreme Court stated in *Stauffer v. Standard Brands, Inc.* that appraisal is, as a rule, the sole remedy available to a minority stockholder whose investment is eliminated in a short-form merger.[41] While relegating a claim of gross inadequacy of price to an appraisal action, the Court also recognized that this exclusivity rule does not interfere with "the ever-present power of equity to deal with illegality or fraud" by, for example, setting aside a merger.[42] Absent a showing of illegality or fraud, however, the Court stated that the minority's claims related only to a difference of opinion as to value, warranting no remedy besides appraisal. In other words, the ability of the minority to seek a judicial determination of fair value countered the risk of the majority offering a discounted price for the minority's shares. Since the plaintiffs in that case did not seek appraisal, the Court affirmed judgment in defendants' favor.[43]

In *Braasch v. Goldschmidt*, decided the next year, the Court of Chancery examined the scope of the exclusivity rule expressly recognized in *Stauffer*.[44] In *Braasch*, the Court decided that if a short-form merger is merely the final step in a "conspiracy to accomplish an unlawful end by unlawful means," *Stauffer* does not bar a claim for equitable class-wide relief.[45] The *Braasch* case implicitly recognizes that, rather than limiting "the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate," [46] *Stauffer* simply makes clear that in the absence of fraud or other illegality, the exclusive remedy in short-form mergers under § 253 is appraisal.

If *Stauffer* and *Braasch* are still good law, I can easily resolve the case now before me, as plaintiffs have failed to show fraud or illegality such as to make the remedy of appraisal an inadequate one. Before undertaking that analysis, however, it is necessary to examine whether subsequent decisions have, expressly or by necessary implication, overruled those cases.

### b. Stauffer is applied to section 251 mergers

The holding of *Stauffer* was extended to long-form mergers in *David J. Greene & Co. v. Schenley Industries, Inc.*, in which

---

39. *Coyne v. Park & Tilford Distillers Corp.*, Del.Supr., 154 A.2d 893 (1959). Plaintiffs in that case argued that the version of section 253 that existed when they purchased their shares provided only for a stock-for-stock merger. Thus, they argued that the payment of cash could not constitutionally be allowed to eliminate their interests.

40. *Id.* at 897.

41. Del.Supr., 187 A.2d 78, 80 (1962).

42. *Id.*

43. *Id.*

44. *Braasch v. Goldschmidt*, Del.Ch., 199 A.2d 760 (1964).

45. *Id.* at 764 (short-form merger that is the merely the culmination of conspiracy to loot the company at expense of minority stockholders is not subject to *Stauffer's* exclusivity rule).

46. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 714 (1983). After making this statement, the *Weinberger* Court specifically "return[ed] to the well-established principles of *Stauffer* . . . ." *Id.* at 715.

Chancellor Marvel held that the rights of the 16% minority stockholders, *vis-à-vis* the 84% majority, were "no greater" under § 251 than under § 253.[47] This represented a significant departure from earlier long-form merger cases that required the majority to prove entirely fair treatment of the minority.[48]

#### c. *Singer and Roland*

Acting in response to public criticism of *Schenley* and Delaware law relating to the freeze-out of minority stockholders,[49] the Delaware Supreme Court held in *Singer v. The Magnavox Co.* that mergers could be enjoined if they were not for a "proper business purpose" and the elimination of minority stockholders was not such a purpose.[50] To the extent *Schenley* conflicted with this holding, it was overruled.[51] The Supreme Court expressly extended the "proper business purpose" rule to short-form mergers in *Roland International Corp. v. Najjar.*[52] There, the Court stated that "the fiduciary obligation owed in the context of a merger, be it long or short, is singular, and falls alike on those who control 'at least 90% of the outstanding shares,' § 253, and those who control a majority but less than 90%, § 251."[53]

#### d. *Weinberger and later short-form cases*

The Supreme Court overruled *Singer's* "proper business purpose" test six years later in *Weinberger v. UOP, Inc.*[54] In that decision, the Court also revitalized the appraisal remedy by adopting a "more liberal, less rigid and stylized, approach to the valuation process. . . ."[55]

For present purposes, it suffices to say that *Weinberger* engendered a dynamic tension between the availability of class-based equitable remedies in the case of parent-subsidiary mergers and the status of appraisal as an exclusive remedy. On the one hand, speaking about appraisal, the Court said "the provisions of [§ 262] . . . shall govern the financial remedy available to minority shareholders in a

---

47. Del.Ch., 281 A.2d 30, 35 (1971).

48. *See, e.g., Sterling v. Mayflower Hotel Corp.,* Del.Ch., 89 A.2d 862, *aff'd,* Del.Supr., 93 A.2d 107 (1952) (controlling stockholder must show entirely fair treatment of minority in merger); *David J. Greene & Co. v. Dunhill, International, Inc.,* Del.Ch., 249 A.2d 427 (1968) (80% stockholder had not established fairness to 20% minority forced to receive convertible preferred stock); *Bastian v. Bourns, Inc.,* Del.Ch., 256 A.2d 680 (1969), *aff'd,* Del.Supr., 278 A.2d 467 (1970) (per curiam) (notwithstanding the availability of appraisal, Chancery Court held trial as to fairness of merger terms).

49. *See, e.g.,* Note, *Going Private,* 84 Yale L.J. 903, 919–928 (1975) (criticizing Delaware's permissive approach to freeze out transactions, which nearly always relegated minority stockholders to appraisal rights, while endorsing the "valid corporate purpose" test enunciated by the U.S. Court of Appeals for the Fifth Circuit in *Bryan v. Brock & Blevins Co.,* 490 F.2d 563 (5th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974)); *see also* Weiss, Elliott J., *Balancing Interests in Cash–Out Mergers: The Promise of Weinberger v. UOP, Inc.,* 8 Del.J.Corp.L. 1, 27, n. 170 (1983) opining that the Delaware Supreme Court's opinion in *Singer* was a response to, *inter alia,* the U.S. Supreme Court's apparent agreement, in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), with the above article and similar criticism of Delaware's treatment of minority stockholders.

50. Del.Supr., 380 A.2d 969 (1977).

51. *Id.* at 979.

52. Del.Supr., 407 A.2d 1032 (1979).

53. *Id.* at 1036.

54. Del.Supr., 457 A.2d 701 (1983).

55. *Id.* at 704.

cash-out merger. *Thus, we return to the well-established principles of [Stauffer] and [Schenley], mandating a stockholder's recourse to the basic remedy of an appraisal.*[56] On the other hand, the Court elaborated on the duty of entire fairness in the parent/subsidiary merger context and the "careful scrutiny" a court of equity must give to such transactions.[57] It was not obvious from the Court's analysis whether it intended to re-establish the dichotomy between appraisal and entire fairness review or, instead, to hold that the "careful scrutiny" entailed in an entire fairness analysis should become part of a statutory appraisal proceeding.

Specifically, after detailing the factors to be considered in determining "entire fairness," the Court concluded that the absence of independent bargaining and critical disclosure defects barred a finding of entire fairness.[58] While significantly broadening this court's ability to consider "all relevant factors"[59] in reaching an appraised value of shares, the Supreme Court concluded that a breach of fiduciary duty occurred and instructed Chancellor Brown, on remand, to calculate, *in addition* to the quasi-appraisal analysis suggested, "elements of rescissory damages" to the extent appropriate.[60] The Court explained:

> While a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chan-

cellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association,* Del.Ch., 156 A. 183, 187 (1931).[61]

There is no discussion in *Weinberger* of whether a § 253 merger should be treated differently than a § 251 merger. The focus on fair process suggests that different treatment is warranted, however, because § 253 empowers 90% parents to accomplish a short-form merger without any process, other than the act of the parent corporation.[62]

*Weinberger's* focus on appraisal as an exclusive remedy quickly blurred (at least in the non— § 253 merger context), most notably in *Rabkin v. Philip A. Hunt Chemical Corp.*[63] In that case, the complaint relied heavily on the allegation that the $20 per share merger was timed to occur shortly *after* the expiry of a one-year commitment to pay a fixed $25 per share price in any second-step merger initiated during that period. Although there was no clear contractual or other duty to engage in the merger during that one-year period, the Supreme Court determined that, in light of allegations focusing on the timing of the merger, a fiduciary duty-based class action remedy was available.[64]

**56.** *Id.* at 715 (emphasis added).

**57.** *Id.* at 710 (citing *Sterling,* 93 A.2d 107; *Bastian,* 256 A.2d 680; and *Dunhill,* 249 A.2d 427 (see section IV.A.2.b, *supra* )).

**58.** *Weinberger,* 457 A.2d at 711–12.

**59.** *Id.* at 713 (citing 8 *Del.C.* § 262(h)).

**60.** *Id.* at 714.

**61.** *Id.*

**62.** *See Andra v. Blount,* 772 A.2d 183, 195, n. 30, Strine, V.C. (2000).

**63.** Del.Supr., 498 A.2d 1099 (1985).

**64.** *Id.* at 1107. The Supreme Court's opinion does not explain how a breach of fiduciary duty could possibly be inferred from Hunt's decision to delay the second step transaction

It has been observed that "[s]ince fairness of price can almost always be related by an imaginative minority stockholder to how the merger was timed, structured, negotiated, or disclosed, *Rabkin*, as a practical matter, obliterated *Weinberger's* reassertion of appraisal as the principal mechanism for resolving fairness issues in cash-out mergers." [65]

Shortly before the Supreme Court's decision in *Rabkin*, then Vice Chancellor (now Justice) Walsh decided *Stepak v. Scharffenberger*, involving a challenge to a § 253 merger. [66] His decision reaffirmed the continuing vitality of *Stauffer*. In *Stepak*, the subsidiary board "expressed no opinion as to the fairness of the merger price because of its inherent conflict of interest ... [and] no independent evaluation as to the fairness of merger price had been undertaken." [67] The plaintiffs did not seek appraisal, asserting instead that the self-dealing rendered an appraisal inadequate. In response, the court stated that "[i]n the context of a short-form merger under § 253 ... self-interest must be expected. Plaintiff has alleged no facts demonstrating that defendants have used their

controlling position to deal with the minority unfairly.... Significantly, there is no contention that defendants misrepresented or failed to disclose the various financial reports. Therefore, plaintiff's claims with respect to the short-form merger must be dismissed." [68]

The vitality of *Stauffer* and *Braasch* was, at least implicitly, also recognized in *Iseman v. Liquid Air Corp.* [69] In that case, a corporation controlling 92% of a subsidiary's stock retained an investment bank to advise it regarding a planned freeze-out merger and then established a special committee of subsidiary directors to represent the subsidiary's minority stockholders. The committee, consisting of three directors of dubious independence, hired its own financial advisor and law firm. The complaint alleged that the special committee's financial expert conducted various analyses that established fair values approximately twice the amount actually "negotiated" by the special committee. The plaintiffs alleged that the firm rewrote its report to the special committee, which was later communicated to the minority stockholders, to omit any discussion of the anal-

---

until after the expiration of the one-year commitment, where no fraud or nondisclosure was alleged and no duty arose to engage in the merger during the one-year period. At the same time, appraisal was arguably not an adequate remedy because the since-expired promise to pay a fixed price was not an element of the corporation's value. Rather, the Supreme Court recognized that the claim it allowed to proceed was in the nature of an action for breach of contract. *Id.* at 1105 ("[Plaintiffs] seek to enforce a contractual right to receive $25 per share, which they claim was unfairly destroyed by Olin's manipulative conduct."). Then Vice Chancellor Berger had reached a different conclusion, finding that damages for unfair dealing (including damages flowing from defendants' deliberate avoidance of the one-year commitment) could be awarded "under the newly expanded appraisal proceeding" recognized in *Weinberger*. *Rabkin v. Philip A. Hunt*

*Chemical Corp.*, DelCh., 480 A.2d 655, 660 (1984). According to the trial court's view of *Weinberger*, the difference was apparently not in the availability of relief, but in the context in which that relief could be awarded, *i.e.* an opt-in appraisal action or a more inclusive class proceeding. *Id.*

**65.** D.A. Drexler, L.S. Black, Jr. & A.G. Sparks, III, *Delaware Corporation Law and Practice*, § 15.12[5] at 15–86 (1999).

**66.** Del.Ch., C.A. No. 6530, Walsh, V.C., 1985 WL 11579 (Aug. 9, 1985).

**67.** *Id.* at 5.

**68.** *Id.* at 8–9.

**69.** Del.Ch., C.A. Nos. 9694, 9833, Berger, V.C., 1989 WL 125234 (Oct. 23, 1989).

yses showing the higher values. The special committee allegedly knew about these omitted analyses.

Then Vice Chancellor (now Justice) Berger held that those "allegations, if true, would lend support to plaintiffs' claim that the special committee *was a sham designed to lull* the public stockholders into believing that their interests had been protected." [70] In a result consistent with the fraud exception of *Stauffer* and *Braasch*, she ruled that the complaint stated a claim for breach of fiduciary duty and refused to find that appraisal was the minority's exclusive remedy. [71]

### e. *The state of the law today*

The state of the law with respect to long-form mergers involving controlling stockholders was well described by Chancellor Chandler in *Wood v. Frank E. Best, Inc.*, as follows:

> The current state of our corporation law is that where, as here, cashed out minority shareholders have plead facts sufficient to indicate a breach of fiduciary duty, which they seek to bring against not only the surviving corporation but against individual directors or majority shareholders as well, the plaintiffs need not demonstrate inadequacy of the appraisal remedy to survive a motion to dismiss. [72]

Chancellor Chandler implicitly recognized that under the Supreme Court's rul-

ing in *Kahn v. Lynch Communication Systems, Inc.*, all long-form mergers involving majority or controlling stockholders will be reviewed under the entire fairness standard, with the burden of proof shifting based on the circumstances involved. [73] Plaintiffs' reliance on *Wood* to apply the same rule to § 253 mergers is, however, misplaced because *Wood* did not involve a § 253 merger.

Two additional cases involving § 253 mergers require detailed consideration. In the first, Vice Chancellor Jacobs held that where the complaint alleged that the parent "conceived and implemented a scheme to lower [the subsidiary's] stock market price to facilitate a cash out merger at an unfair price," plaintiffs "establish[ed] an actionable breach of fiduciary duty affecting the merger price that could not be addressed in an appraisal." [74] Vice Chancellor Jacobs identified the scheme as the principal factor justifying an exception to the rule, even though the plaintiffs also alleged an absence of an independent process to establish fairness and raised claims relating to the timing of the merger. The Vice Chancellor cited *Schnell v. Chris-Craft Industries, Inc.* [75] to support his conclusion that an inequitable scheme, though technically lawful, could nevertheless provide the basis for equitable relief. He could as easily have cited to *Stauffer* [76] and *Braasch.* [77] Following discovery, the court allowed plaintiffs to proceed to trial. [78]

---

**70.** *Id.* at 8 (emphasis added).

**71.** *Id.* at 9.

**72.** Del.Ch., C.A. No. 16281, mem. op. at 15, Chandler, C., 1999 WL 504779 (July 9, 1999).

**73.** Del.Supr., 638 A.2d 1110, 1117 (1994).

**74.** *Seagraves v. Urstadt Property Co., Inc.*, C.A. No. 10307, mem. op. at 9, Jacobs, V.C., 1989 WL 137918 (Dec. 4, 1989).

**75.** Del.Supr., 285 A.2d 437 (1971).

**76.** Del.Supr., 187 A.2d 78 (1962).

**77.** Del.Ch., 199 A.2d 760 (1964).

**78.** *See Seagraves v. Urstadt Property Co. Inc.*, Del.Ch., C.A. No. 10307, Jacobs, V.C., 1996 WL 159626 (Apr. 1, 1996). In its 1989 opinion, the court determined that a claim for breach of fiduciary duty was alleged, thus rendering appraisal an available, but not exclusive remedy. In considering the subsequent motion for summary judgment, the court apparently again considered whether

*Nebel v. Southwest Bancorp, Inc.* is another case that fit the *Braasch* exception to *Stauffer's* exclusivity rule but which was analyzed using concepts of entire fairness.[79] In that case, a short-form merger was completed unilaterally, and the plaintiffs alleged that the parent set the price without any consideration of what would be fair. Vice Chancellor Jacobs considered the tension between *Stauffer's* exclusivity rule and *Weinberger's* broad exception (as interpreted in *Rabkin*) based on unfair dealing. He tried to find coherence in these holdings by concluding that "certain types of unfair dealing, although not involving fraud or deception, may be so egregious as to make it inequitable to relegate the minority shareholders to the appraisal remedy, even though as a practical matter the unfair dealing impacts only the merger price." [80]

While the plaintiff alleged that the absence of an independent process justified a finding that appraisal was not the exclusive remedy, Vice Chancellor Jacobs found the claim "not actionable, because under § 253 there is no requirement to obtain such input, and the failure of the directors to obtain such input, without more, is not a breach of fiduciary duty." [81] As to the claim that the fair value of the shares far exceeded the $41 price offered, Vice Chancellor Jacobs found appraisal to be adequate.[82]

However, in light of a disclosure violation that directly and materially affected the minority stockholder's ability to decide whether to accept the consideration or seek appraisal,[83] Vice Chancellor Jacobs granted a "quasi-appraisal," i.e., appraisal for the entire class of minority stockholders.[84] This result is consistent with the principles laid down in *Stauffer* and *Braasch.*

Plaintiffs rely heavily on the court's later opinion on a motion to dismiss the second amended complaint in the quasi-appraisal action, in which the court held that an entire fairness claim was adequately alleged.[85] In the appraisal action, which was tried first, the court determined that the fair value of the subsidiary's stock was $85, or *more than twice the merger consideration.* Vice Chancellor Jacobs identified two factors that warranted a finding of unfair dealing. Naturally, he pointed to the $85 appraised value and held that the "significant gap" created an inference that the merger was the product of unfair dealing. Also, he noted that although the statute does not require a process, the complete absence of a fair process, combined with other pleaded facts, stated a cognizable claim for unfair dealing.[86] In that regard, the court held that the ruling in *Nebel I* did not "detract from the principle that fiduciaries who stand on both sides of

---

appraisal was an adequate remedy, this time by considering the facts in the context of an entire fairness analysis. I do not take this aspect of the 1996 opinion to require the court to undertake a full entire fairness analysis before determining whether appraisal is the exclusive remedy.

79. Del.Ch., C.A. No. 13618, Jacobs, V.C., 1995 WL 405750 (Jul. 5, 1995) (Nebel I).

80. *Id.* at 7.

81. *Id.* at 7–8 (citations omitted).

82. *Id.* at 8.

83. Specifically, the parent corporation attached the wrong state's appraisal statute to the notice of merger sent to the minority stockholders.

84. *Id.* at 12.

85. *Nebel v. Southwest Bancorp, Inc.*, Del.Ch., C.A. No. 13618, Jacobs, V.C., 1999 WL 135259 (March 9, 1999) (Nebel II).

86. *Id.* at 17–18.

a merger (even under § 253) and dictate its terms have the burden to show that the merger was entirely fair." [87] Instead of then conducting an entire fairness analysis, however, the court used the $85 appraised value to set the "out-of-pocket" damages for the breach of duty, and advised the parties that the case was effectively over unless plaintiffs wished to seek an additional award of rescissory damages.[88]

Plaintiffs, naturally, argue that *Nebel II* stands for the proposition that the entire fairness standard of review applies to short-form mergers. I do not give it such a broad reading. One of the claims in *Nebel II* was that "defendants withheld dividends from the minority *and made improper loans to Southwest, thereby facilitating Southwest's purchase of additional shares and ultimately, its accomplishment of the short-form merger.*" [89] Although the opinion does not discuss *Braasch*, these allegations parallel those found in *Braasch* to justify the maintenance of a class action for breach of fiduciary duty. In any event, there is nothing in *Nebel II* that suggests or requires a different *result* in this case, merely a different method of analysis.

In conclusion, I hold that *Stauffer* and *Braasch* remain authoritative expressions of the law. Thus, I will not apply the *Weinberger* entire fairness test to the UXC short-form merger, simply because Unocal "st[ood] on both sides of the trans-

action." [90] To do otherwise would gut the short-form merger statute of its meaning. For better or worse, the legislature granted a 90% parent corporation the right to merge the subsidiary out of existence unilaterally and provided an appraisal remedy for the minority stockholders in each such instance. It is simply inconsistent with that grant of power to superimpose on its exercise, in every case, an analysis of the "procedure" employed in fixing the terms of the merger.

## B. The Process Employed by Unocal Was Not a Fraud or a Sham

For the reasons next discussed, I conclude that plaintiffs' claims of wrongdoing do not satisfy the *Stauffer* standard of fraud or illegality.[91] Unocal established the Special Committee in a good faith effort to achieve a fair price for UXC's minority stockholders. The Special Committee accomplished all that is required of a parent seeking to complete a short-form merger. Indeed, plaintiffs' own valuation expert, Gilbert Matthews, essentially conceded that the 0.54 exchange ratio was not materially unfair as of February 24, 1992. Finally, plaintiffs cannot show that either the exclusion of Mobile 904 from the valuation of UXC or the decision not to revise the 0.54 exchange ratio establishes fraud. Simply, plaintiffs did not prove that the Special Committee "was a sham designed to lull the public stockholders into believ-

---

**87.** *Id.* at 17.

**88.** *Id.* at n. 32. The "out-of-pocket" damages could be set because the appraisal was a "quasi-appraisal," applying to the whole class of minority stockholders. As such, the only reason to keep litigating would be if the class wanted additional damages.

**89.** *Id.* at 16 (emphasis added).

**90.** As I earlier noted, there is, in actuality, only one side to a short-form merger.

**91.** In *Stauffer,* the Supreme Court spoke of the "ever-present power of equity to deal with illegality or fraud." *Stauffer,* 187 A.2d at 80. I understand this reference to encompass concepts of both legal and equitable fraud. *See Weinberger,* 457 A.2d at 714 (referring, pertinently, to "fraud, misrepresentation ... deliberate waste of corporate assets, or gross and palpable overreaching ...").

ing that their interests had been protected." [92] Thus, plaintiffs cannot argue that the use of the Special Committee duped stockholders into foregoing their appraisal rights.

█ I have no trouble concluding that Unocal created the Special Committee in good faith, to ensure that UXC's minority stockholders would be offered a fair price for their shares. Indeed, while plaintiffs challenge the Special Committee's independence and functioning, they offer no evidence that causes me to question Unocal's motives for creating the committee.[93] Importantly, Unocal disclosed in clear terms to the UXC minority stockholders that each of the Special Committee directors was also a Unocal director.

█ Plaintiffs attack the Special Committee as not truly "independent" of Unocal.[94] In the context of the narrow question, *not relevant in this case*, of whether the efforts of these Special Committee members would provide the basis for shifting the burden of proving entire fairness, I agree with plaintiffs. Quite simply, each Committee member was a director of UXC and also a director of Unocal. In the plainest sense of the term, they had "divided loyalties." [95] Moreover, since Unocal never surrendered its statutory right to complete the merger unilaterally, it is hard to conclude that the Committee and Unocal engaged in genuine, arm's-length negotiations.

These observations, however, do not lead me to discard the Special Committee's work or to regard it as legally deficient. Rather, I look at it as if Unocal had created a special committee of its own board of directors and charged its members with representing the interests of the minority in negotiating the terms of the short-form merger. By setting up the Committee, Unocal established a structure (albeit not legally independent) intended to ensure that all factors relevant to the pricing decision were carefully considered by a party whose stated purpose was to speak for the minority stockholders.

That is precisely what the Special Committee accomplished. Each member of the Special Committee knew that he or she had divided loyalties but was instructed to focus on the interests of the minority stockholders, specifically by seeking a price that was fair to them. Moreover, based on my review of the depositions and my perceptions of the trial testimony, I am convinced that the Committee members took their assignment seriously and focused on the minority's best interests. The minutes of the meetings show that the Committee continually and aggressively questioned both PaineWebber and the Unocal representatives regarding the timing and structure of the proposed merger. The members expressed healthy skepticism of what Sleeman and Maxwell told

---

**92.** *Iseman v. Liquid Air Corp.*, Del.Ch., C.A. Nos. 9694, 9833, mem. op. at 8, Berger, V.C., 1989 WL 125234 (Oct. 23, 1989).

**93.** Moreover, the record before me indicates that Unocal created the Special Committee (1) to limit the risk of liability if a court applied the entire fairness standard to the transaction and perhaps, (2) to foster an atmosphere in which to achieve a settlement of the then-pending class action litigation with the minority stockholders. Neither of these purposes suggests fraud or sham.

**94.** *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 9.35 (3d. ed.1999) (discussing relevant factors in determining whether special committee is independent and warrants burden shifting).

**95.** *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983).

them. They carefully considered their "negotiating strategies" and insisted that PaineWebber pursue aggressive bargaining positions.

While the Special Committee members were not "independent" of Unocal in the typical legal sense of that term, and perhaps were affected in certain respects by their continuing positions with Unocal, the Committee's efforts should not be used as a basis for undermining the adequacy of the appraisal remedy in this case. If Unocal, before acting unilaterally, conducted the minority-focused analysis performed by the Committee, plaintiffs clearly would fail to show fraud or illegality. That the Committee conducted the analysis in Unocal's stead does not change the result.

Before moving on to the disclosure-based claims, however, I briefly consider two of plaintiffs' substantive unfairness claims. The first rests on information that the Committee allegedly did not have before it, but which should have been brought to the Committee's attention, namely, the value of Mobile 904. The second claim rests on what plaintiffs cast as a red flag, namely, the effect of fluctuations in gas prices, between February 24 and May 2, 1992, on UXC's value.

■ First, the value of Mobile 904 was plainly immaterial to UXC's overall value. Thus, the failure to include the property in a valuation of UXC fails to show fraud. Based on the testimony of HD Maxwell, I also conclude that the Committee was not misinformed about Unocal's plans to develop the property.[96] In a sense, this claim is counterintuitive. If Unocal truly wanted to hide valuable information from the Special Committee, it would not have publicly disclosed the find as it did. Unocal advised the Special Committee that the find was not material and not likely to add to UXC's revenues in the near future. The record supports this advice.

I note that if plaintiffs had sought an appraisal, I might include the 1% of additional value provided by Mobile 904. That is the utility of an appraisal. For present purposes, however, the failure to separately discuss and consider the value of Mobile 904 does not show fraud on Unocal's part.

Based on the Committee's good faith analysis and consideration of a fair price to offer the UXC minority, Unocal set the 0.54 merger exchange ratio on February 24, 1992. Unocal indicated that the merger would be completed by May 2, 1992. About eight weeks later, Unocal (through the Special Committee) revisited the issue

---

**96.** I reach this conclusion for two basic reasons. First, despite some preliminary investigation at lower levels of management, Maxwell had not been presented a formal "Authority for Expenditure" request. Absent his authorization, coupled with that of the executive committee, no plan could go forward. Second, plaintiffs' reliance on Unocal's disclosures to the federal government regarding intended production commencement dates is misplaced. Maxwell explained that Unocal reported to the Minerals Management Service ("MMS"), which regulates federal leases for offshore development. Maxwell stated that the assertion in the official report pointed out by plaintiffs merely evidences:

our desire and good faith to put this field on production January 1st, '94. But it certainly was not—this kind of stipulation wouldn't have influenced the executive committee as to whether or not they approved the project. It was a plan which was, as I say, in good faith and it may or may not have been carried out.

The history of plans with MMS was that you very often have to revise those plans because later events would show that they weren't appropriate.

Tr. at 242. It is clear to me that Unocal's decision to begin or delay development of a project depended on internal considerations of relevant business factors, and not on some external, non-binding representation to the MMS.

of the fairness of the merger consideration. Plaintiffs argue that the Special Committee ignored certain "red flags" in determining (1) not to seek a full bring down opinion from PaineWebber and (2) that the 0.54 ratio was still a beneficial offer for the minority stockholders. Before considering this claim, it is worth noting that the value of the merger consideration to the plaintiff class *increased almost 18%* from $11.68 as of February 24, 1992 to $13.77 as of May 2, 1992.

■ I first review Unocal's decision not to obtain a bring-down opinion from PaineWebber. The evidence at trial made clear that full bring-down opinions are the exception, not the rule. Naturally, changes between the date of a fairness opinion and the date of merger completion can be so great as to render an earlier fairness opinion unreliable.[97] However, the clear evidence shows that the Special Committee asked PaineWebber to revise certain aspects of its prior analysis and inquired whether PaineWebber still stuck by its previous opinion. PaineWebber reported that, based on its additional work, the 0.54 exchange ratio remained fair. In the circumstances, there was no reason to incur the expense of a completely new fairness opinion.[98]

Plaintiffs make several observations that, they say, cast doubt on the Special Committee's good faith in deciding not to inquire further into whether the 0.54 exchange ratio was still fair during April and May 1992. First, plaintiffs argue that although PaineWebber expressly revised one of its analyses and reaffirmed its belief that the merger was fair as of February 24, 1992, PaineWebber indicated that if it had conducted that same analysis using then—current market information, UXC's value would have increased. Plaintiffs misconstrue the record of what Paine-Webber told the Special Committee on April 21, 1992. According to the meeting minutes, it appears that PaineWebber stated that the values of *both* companies would rise along with higher gas prices.[99] Taken in context, the Committee reasonably concluded that increased gas prices improved the values of both Unocal and UXC.[100]

Again, this case is unlike the situation presented in *Iseman v. Liquid Air Corp.*,[101] in which the special committee allegedly ignored two of its financial advisor's valuation methodologies that resulted in values significantly higher than the actual merger price, and failed to disclose those results to the stockholders. Here, there is no proof that the Special Committee or Unocal affirmatively closed its eyes to relevant information. On the contrary, the Committee conducted some investigation into whether the exchange ratio was still fair, and, *when its advisor indicated its continued confidence in the merger price*, decided not to require further investigation. McLaughlin testified that, based

---

**97.** *See Behrens v. United Investors Management Co.*, Del.Ch., C.A. No. 12876, mem. op. at 27, Allen, C., 1993 WL 400209 (Oct. 1, 1993) ("Perhaps some set of intervening changes in public markets would be such as to require diligent directors to, in effect, say 'How could it be that the deal we earlier negotiated is still fair to the minority?' ").

**98.** *Id.* (holding that a revised fairness opinion is not needed unless the parent knows or should know that the opinion is no longer reliable).

**99.** See section II.E, *infra* (quoting from the minutes of that Committee meeting).

**100.** Indeed, at that same meeting, Paine-Webber's representative stated that fluctuations in Unocal's market price seemed more pronounced, and more correlated to shifting gas prices, than that of UXC.

**101.** Del.Ch., C.A. Nos. 9694, 9833, Berger, V.C. (Oct. 23, 1989).

on her understanding of the supplemental information, "nothing ... indicated any reason to ask for a whole other go at a fairness opinion." [102]

In sum, the decision not to inquire further does not come close to satisfying the *Stauffer* standard. Simply put, plaintiffs have not shown why their interpretation, i.e., that PaineWebber's supplemental analysis is the "smoking gun" in this case, is more reasonable than the Special Committee's interpretation, i.e., that Paine-Webber's commentary, though useful and relevant, did not alter its view of the original exchange ratio.

Plaintiffs' final substantive argument, regarding supposed fluctuations in the stock prices of other "pure play" gas companies, is also unavailing. Plaintiffs point to a substantial (about 20%) rise in the market values of UXC's comparable companies. They say that, had the merger not been announced, UXC's unaffected market price would have mirrored that of the comparable companies. Plaintiffs claim that UXC stockholders "should have received at least 10–13% more, or $1.38 to $1.79 per share, as of the time of the Merger."

Disregarding that this contention could easily have been addressed in an appraisal, I consider the argument briefly. First, defendants point out that UXC stock did not behave like the comparables when gas prices first fell. While the five comparable companies identified by plaintiffs' expert lost about 13.4% of their value between December 31, 1991 and February 24, 1992, when prices fell, UXC stock actually increased 1.3% during that time period. Thus, the rebound in gas prices would not necessarily have as great an upside effect as plaintiffs suggest.

Second, plaintiffs' allegation that the stock prices of the comparables increased by 20% while Unocal stock only increased by 7% depends on which day one focuses upon. Specifically, Matthews compared Unocal's stock price on February 14, 1992 with its price at the end of April. Defendants argue that Unocal's price was higher on February 14 than it was on either February 24, the day the merger was announced or February 21, the operative date for the Special Committee's final analysis.[103] As such, the rise in Unocal's price was more closely correlated to the rise in the comparative companies than plaintiffs claim.[104] Notwithstanding plaintiffs' efforts, I do not find credible their argument that those fluctuations were significant enough to render Unocal's setting of the 0.54 exchange ratio a fraud.

## C. Plaintiffs' Attack on the Disclosure in the Information Statement Fails to Show that the Appraisal Remedy is Inadequate

The parent corporation in a short-form merger under § 253 "bears the burden of showing complete disclosure of all material facts relevant to a minority shareholders' decision whether to accept the short-form merger consideration or

---

**102.** Tr. 101–102.

**103.** Plaintiffs' explanation for using February 14 is quite reasonable. The stock prices used for PaineWebber's prior analysis, though presented on February 21, did not include price levels after February 14. Plaintiffs picked up where PaineWebber left off.

**104.** I also note that the change in value in the comparable companies, even if significant when compared to the movement in Unocal's stock price, would only impact one of the four different methodologies used by PaineWebber in reaching its opinion. These methods were the market value, net asset value, discounted cash flow and the comparable transactions analyses.

seek an appraisal."[105] The parent need not provide *all* the information necessary for the stockholder to reach an independent determination of fair value; only that information material to the decision of whether or not to seek appraisal is required.[106] Plaintiffs correctly point out that "a non-disclosed fact need not be material standing alone if its non-disclosure in light of disclosure material could cause stockholders to be misled."[107]

The issue is thus whether any of the facts omitted from or allegedly misrepresented in the Information Statement are material. The materiality standard is the same for plaintiffs' state law claims and the federal securities law claims under the Securities Act of 1933.[108] In *Rosenblatt,* the Delaware Supreme Court adopted the materiality standard described by the United States Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*[109] That test:

> does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

as having significantly altered the "total mix" of information made available.[110]

Several of plaintiffs' disclosure claims focus solely on the efforts of the Special Committee. When the alleged disclosure defects "relate to the process by which the proposed price was reached, agreed upon and determined to be fair," but do not allege that the financial information actually provided to minority stockholders was in any way deficient, it is less likely that the details of process will be material.[111] More important for present purposes, with one possible exception that is addressed below, plaintiffs do not allege that the Information Statement failed to describe any material aspect of the Special Committee's efforts.

The substance of plaintiffs' claims of inadequate disclosure is as follows:

1. *Basis for and Purpose of the Paine-Webber April 29 Letter*

Plaintiffs argue that "the Information Statement misleadingly omitted information regarding PaineWebber's April 29 revised analysis and the April 29 letter.... [T]he Information Statement described the decisions of the Special Committee and PaineWebber as being fair in the present tense, and described the April 29 Opinion as confirming the February 24 Opinion 'that the consideration issued in the Merg-

**105.** *Shell Petroleum, Inc. v. Smith*, Del.Supr., 606 A.2d 112, 114 (1992).

**106.** *Skeen v. Jo–Ann Stores, Inc.*, Del.Supr., 750 A.2d 1170, 1174, Berger, J. (2000).

**107.** Citing to *Klang v. Smith's Food & Drug Centers, Inc.*, Del.Supr., 702 A.2d 150, 156 (1997).

**108.** *Rosenblatt v. Getty Oil Co.,* DelSupr., 493 A.2d 929, 944 (1985).

**109.** 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

**110.** *Rosenblatt*, 493 A.2d at 944.

**111.** *See Behrens v. United Investors Management*, Del.Ch., C.A. No. 12876, mem. op. at 23, Allen, C., 1993 WL 400209 (Oct. 1, 1993).

er is fair to the stockholders of UXC . . . from a financial point of view.' "[112]

Contrary to these assertions, the Information Statement makes clear that the 0.54 exchange ratio was negotiated in February and the PaineWebber fairness opinion speaks to the fairness of the transaction as of February 24, 1992. The Information Statement also clearly communicates that the boards of directors of Unocal and UXC believed that the 0.54 exchange ratio remained fair as of the May 2, 1992 merger date. Thus, the reasonable investor understood precisely the timing of material events and opinions. Moreover, investors knew that PaineWebber's April 29, 1992 letter communicated only that, based on its limited review of the identified supplemental information, PaineWebber stuck to its February 24, 1992 Opinion. The April 29 letter was clearly *not* an opinion that the merger was fair as of May 2, 1992, and investors could have discerned this fact by simply reading the copies of the Opinion and the letter, both of which were attached to the Information Statement.

Plaintiffs also claim that the April 29 letter, which was attached to the Information Statement, did not describe the circumstances underlying its issuance, i.e., that PaineWebber reviewed limited information and updated only one of its prior analyses. Plaintiffs also argue, incorrectly, that PaineWebber told the Special Committee that the value of UXC stock would increase if then—current market information were used.

The April 29 letter states specifically that PaineWebber was not requested to review and did not review any information other than (1) Unocal's and UXC's 10-Ks for the year ended December 31, 1991, (2) estimated future production quantities and required capital expenditures for Unocal's oil and gas reserves and (3) Unocal's and UXC's preliminary financial results for the first quarter of 1992. The April 29 letter does not specifically describe the extent of PaineWebber's revised analysis, but I conclude that level of detail was immaterial as a matter of law.

Finally, PaineWebber did not conclude that the relative values of Unocal and UXC materially diverged in the intervening two months. Rather, PaineWebber told the Special Committee that the values of both companies had increased in the interim. It was not material to disclose that confirmatory point.

### 2. The 0.54 Exchange Ratio Was the Special Committee's "Bottom Line"

Plaintiffs argue that the stockholders should have been informed that the Special Committee unanimously decided to seek a 0.55 ratio and to accept 0.54 only if necessary. Taking the reduced ratio became necessary when Sleeman reacted negatively to the proposed 0.55 ratio. Plaintiffs argue that these circumstances and the fact that the Committee would not go below 0.54 were material facts.

Of course, "a company is not required to provide a 'play-by-play' account of [the] negotiations" of a merger.[113] Plaintiffs contend, however, that the acceptance of the "bottom line" price was material because "the minority shareholders were assigned the undisclosed risk of any increase in the value of UXC. . . ." According to plaintiffs, that risk was undisclosed because the discussion of PaineWebber's

---

**112.** Reply Brief at 25 (quoting DX 11).

**113.** *Klang v. Smith's Food & Drug Centers*, Del.Ch., C.A. No. 15012, mem. op. at 24, Chandler, V.C., 1997 WL 257463 (May 13, 1997).

April 29 letter "misleadingly implied that the Special Committee was still actively considering whether the 0.54 exchange ratio was still fair under the circumstances prevailing at the time of the Merger."

Plaintiffs' contention is factually wrong. The Special Committee did, in fact, consider whether any changes since February 24 were so material as to cast doubt upon the fairness of the exchange ratio. The Committee concluded that no changes were material. But, as the Information Statement plainly discloses, the "negotiation" over that ratio occurred in February, not April.

In any event, plaintiffs' belief that the details of the "negotiations" were pertinent to stockholders rests on a mistaken reliance on *Sonet v. Plum Creek Timber Co., L.P.*[114] In that case, Vice Chancellor Jacobs found a disclosure document materially misleading partly because it created the impression that an independent special committee aggressively negotiated on behalf of the class plaintiffs while omitting facts showing that the committee was not entirely independent and that negotiation was minimal, at best.[115]

Here, the Information Statement clearly disclosed that the Special Committee members were also directors of Unocal. More importantly, the disclosure of the "merger discussions" is contained in one brief paragraph. Thus, the Information Statement does not create any false impression of the process followed by Unocal and UXC.

Notwithstanding the above, should the Special Committee have disclosed that they hoped to obtain 0.55 but settled for the 0.54 exchange ratio? PaineWebber explained that *any ratio* between 0.53 and 0.55 would be satisfactory. The Committee chose to seek the high end of that range, and settled for the middle number. How it chose to negotiate Unocal to that point is, plainly, immaterial to investors.

3. *Fluctuations in Gas Prices and in the Market Prices of UXC's Comparable Companies Were Not Disclosed*

According to plaintiffs, "a material event occurred subsequent to the [February 24, 1992] valuation. That material event affected the value of UXC. Nowhere in the disclosure statement is there any discussion of the material event or its effect on the value of UXC."[116] Plaintiffs' "material event" is the change in gas prices and, more importantly, the effect that change would have had on PaineWebber's prior valuation analyses.

Although gas prices were publicly known, plaintiffs correctly point out that stockholders could not have considered the impact prices had on UXC's comparable companies because the Information Statement does not disclose the identity of PaineWebber's comparables. The failure to identify those companies and to provide the details of PaineWebber's valuations is argued to be material.

This point again turns on whether the additional information can be deemed to be material.[117] Because I concluded that the

---

114. Del.Ch., C.A. Nos. 16639, 16931, Jacobs, V.C. (Mar. 18, 1999).

115. *Id.* at 21–26.

116. Opening Brief at 42.

117. I note that SEC regulations did not require Unocal or UXC to publicly disclose the details of PaineWebber's analytical work, including the identity of the comparable companies. I also note that such disclosure is required by federal law in certain other types of short-form mergers. *See generally* Rule 13e–3, 17 CFR § 240.13e–3, and Schedule 13e–3, 17 CFR § 240.13e–100, Item 9.

Special Committee properly concluded that whatever impact gas prices may have had was not material, I see no reason to conclude that the same information would have been material to the stockholders. Considering that according to defendants, PaineWebber's original analysis had an embedded assumption that gas prices would rise above the late 1991 levels, it is unremarkable that nobody saw fit to disclose that fact when prices indeed rose. Moreover, as discussed elsewhere in this Opinion, the record does not support the conclusion that the changed market conditions warranted any revision to the established exchange ratio.

4. *Unocal Controlled the UXC Special Committee and Did Not Provide Complete Information Regarding New Discoveries and the Development Plan*

For the reasons discussed in section IV.B, *infra*, the independence of the UXC Special Committee does not bear on this matter because there is no inquiry into entire fairness, thus no occasion to determine whether the burden of proof is shifted. While one could conceive of a situation in which disclosing to stockholders that a Special Committee was independent could give rise to liability, this is not such a case.[118]  Here, Unocal did not encourage stockholders to rely centrally on the efforts of the Special Committee. Rather, Unocal advised UXC stockholders of the Committee's existence, including the fact that each Committee member was a Unocal director, and briefly outlined the Committee's efforts. The stockholders were still given all of the information they reasonably needed to reach their own conclusion about the utility of seeking appraisal.

Thus, the plaintiffs were not deceived into relying on the Special Committee to protect their interests.

■ Moreover, I find that Unocal did not misrepresent the value of Mobile 904 to the Special Committee, or to the stockholders. Sleeman and Maxwell stated that Mobile 904 would not add materially to UXC's reserves. Even accepting plaintiffs' estimate of Mobile 904's value, it would not have added more than 1% to the value of the entity. For that reason, whether or not Unocal planned on developing Mobile 904 was immaterial to UXC's stockholders.

## V. CONCLUSION

Plaintiffs failed to prove fraud, overreaching or illegality in connection with the May 2, 1992 short-form merger of Unocal Exploration Corporation into Unocal Corporation. As such, appraisal was the stockholders' sole remedy. Since neither plaintiffs nor any other stockholders sought to exercise their appraisal rights, I will enter judgment in defendants' favor. Counsel are instructed to confer on an order implementing this decision and to present it to the court within thirty (30) days from this date.

---

118.  *See, e.g., Sonet v. Plum Creek Timber Co., L.P.*, Del.Ch., C.A. Nos. 16639, 16931, Jacobs, V.C., 1999 WL 160174 (Mar. 18, 1999); *Iseman v. Liquid Air Corp.*, Del.Ch., C.A. Nos. 9694, 9833, mem. op. at 8, Berger, V.C., 1989 WL 125234 (Oct. 23, 1989).